IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

VENUS FASHION, INC.,

      Plaintiff,

v.                                  Case No.:  3:16-cv-00907-BJD-MCR

CONTEXTLOGIC, INC., and
WISH, INC.,

      Defendants.

_____/

## DEFENDANT CONTEXTLOGIC'S MEMORANDUM IN OPPOSITION TO PLAINTIFF VENUS'S APPLICATION FOR PRELIMINARY INJUNCTION

Defendant ContextLogic, Inc. ("ContextLogic") is an online service provider, allowing third-party merchants to upload information and content concerning their products to ContextLogic's system so that the information is available to users of a mobile application sponsored by ContextLogic, and through the website located at www.wish.com. As set out in greater detail below, ContextLogic has strict policies against any of its third-party merchants infringing the intellectual property rights of others, and has policies and systems in place to address the concerns of intellectual property holders expeditiously when it receives notice of alleged intellectual property violations by its third-party merchants.

Pursuant to these policies and systems, ContextLogic acted expeditiously to take down posts allegedly infringing on the intellectual property rights of the Plaintiff, Venus Fashion, Inc. ("Venus") when ContextLogic received notice of those posts from Venus in

March and May of this year.   In addition, after receiving the notices from Venus, ContextLogic began using computer software that it has developed to monitor activity on the ContextLogic system in an effort to identify posts containing the same images that were the subject of previous Venus notices.   To date, ContextLogic has identified and taken down over 17,000 posts that appeared to use the same images in which Venus claims copyrights as posts previously taken down by ContextLogic.

As established below, Venus's claims of copyright infringement are meritless in light of the facts set out below, and because any actions taken by ContextLogic are subject to the safe harbor provisions contained in the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512. In addition, the motion should be denied because Venus has already received relief, by way of ContextLogic's unilateral action, beyond that which the law would impose on ContextLogic and any further relief would impose undue hardships on ContextLogic.

## I.     STATEMENT OF FACTS.

### A.     The Business of ContextLogic.

ContextLogic is a Delaware corporation with its principal place of business in San Francisco, California.   (Chuang Decl. ¶ 3).   It began business in San Francisco in 2010 and has had offices there ever since.   (*Id.* ¶ 4).   It currently employs 149 people.   (*Id.* ¶ 5).

ContextLogic operates a website located at www.wish.com (the "Wish Website"). (*Id.* at ¶ 6).   It also operates through a mobile application that can be downloaded on to a user's cell phone or other PDA under the mark WISH (the "Wish App").   Over 155 million users have downloaded the Wish App since it was first offered.   (*Id.* at ¶ 9).

Third-party sellers, referred to as "Merchants," offer for sale products through posts that may be accessed through the Wish App and the Wish Website. (*Id*. at ¶ 10). Merchants offer a wide variety of products through ContextLogic's Wish App and the Wish Website. The majority of those products are not women's clothing or accessories. (*Id*. at ¶ 11).

Contextlogic does not itself post items available for sale. All postings, including any images included in those postings, are made by third-party Merchants. Those Merchants are responsible for their posts, including the images included in any post. (*Id*. at ¶ 12). ContextLogic does not take ownership of the products being offered for sale through the Wish App and the Wish Website. Rather, it serves as a passive conduit, receiving a commission for facilitating the transaction between the Wish App user and the Merchant. (*Id*. at ¶ 13). ContextLogic does not take possession of Merchant's products, nor does it ship those products. (*Id*. at ¶ 14).

ContextLogic currently has approximately 110,000 Merchants who are posting items that are available from those Merchants. (*Id*. at ¶ 15). There are currently approximately 71.8 million items available through the Wish App or the Wish Website. (*Id*. at ¶ 16). Approximately 490,000 items are added each day. (*Id*. at ¶ 17). Each item offered through the Wish App or the Wish Website has its own "product detail page," associated with a unique URL. (Brydum Decl. ¶ 11). ContextLogic's role with respect to third-party Merchant offerings and content uploaded by the Merchant is limited and passive. ContextLogic does not suggest prices for products, does not provide images the Merchant may use in promoting its products, or involve itself in third party sales except to set parameters on terms and conditions of use. (*Id*. at ¶ 14).

In some instances, ContextLogic's platform may identify portions of a post uploaded by one of its Merchants to be included in an email reminder to a user or in other efforts to make a potentially interested user aware of the post.  (Xie Decl. ¶¶ 5-10).  In all cases, the choice of content delivered and the selection of the user to whom the content is delivered are completely automated and driven by the user's activity.  (*Id.* at ¶¶ 6-9).  If a post is taken down because of allegations that the post or content in the post may violate a third party's intellectual property rights, that post and its contents promptly cease to be available or used for email reminders or other purposes.  (*Id.* at ¶ 10).

### B.  ContextLogic's Efforts to Prevent Copyright Infringement on Its System.

ContextLogic takes the intellectual property rights of third parties very seriously.  It has had policies in place prohibiting Merchants from infringing on third party intellectual property rights since it began allowing Merchants to post products for sale on the Wish App and Wish Website.  (Chuang Decl. ¶ 18).  It has instituted a Brand Partner Program to assist third party intellectual property holders in protecting their intellectual property rights on the Wish App and Wish Website.  ContextLogic also has and enforces a Copyright Dispute Policy. (*Id.*; Brydum Decl. ¶ 9 and Ex. B).  All Merchants are subject to these policies. (Brydum Decl. ¶ 7).

Requests to take down posts that may infringe the intellectual property rights of others are directed to Elisa Brydum and her nine-member content management team.  (*Id.* at ¶ 17).  ContextLogic typically takes action within 12-24 hours of receipt of a take-down request.  (*Id.* at ¶ 19).

**C.      ContextLogic's Interactions with Venus.**

ContextLogic has received requests from Venus to investigate allegations of copyright infringement on two occasions, the first in March 2016 and the second in May 2016.  (*Id.* at ¶ 20).  In both instances, ContextLogic responded expeditiously and took down the posts identified by Venus when the requests included information reasonably sufficient to permit Wish to locate the posts for take-down.  (*Id.* at ¶¶ 21-27).  It also provided to Venus the contact information of the Merchants at issue.  (*Id.* at ¶ 31).

**D.      ContextLogic's Affirmative Efforts to Prevent Future Use of Images in Which Venus Claims Copyrights.**

ContextLogic informed Venus in early June that it was developing technology that would assist it in identifying those instances in which a Merchant uploaded a post that contained an image that was the same as an image contained in a previous post that had been taken down because someone had alleged that the post violated its copyrights.  (Dkt. 2-16 at 4-5).  ContextLogic began using that technology in early June.  (Brydum Decl. ¶ 36).  To date, over 17,000 posts have been identified as posts that may be using images from posts previously identified by Venus and, after investigation, have been taken down. *(Id.* at ¶ 37).

As part of its preliminary injunction papers, Venus included an exhibit represented to contain screenshots taken from July 6-8, 2016 of posts viewable on the Wish Website that contain images in which Venus allegedly holds a copyright, or derivative of those images. ("Exhibit B," Dkt. 2-10).  Venus did not provide any of these screenshots to ContextLogic before filing its complaint.  (Brydum Decl. ¶ 40).  ContextLogic has investigated the images depicted in Exhibit B since receiving those images.  In some instances, the image from the Wish Website has been flipped horizontally from the original version of the allegedly

copyrighted image.  (*See, e.g.*, Dkt. 2-10 at 4).  In other instances, the image was cropped, using less than the entire copyrighted image.  (*Id.* at 6).  Nevertheless, and after the opportunity to review the posts, ContextLogic has taken down 60 posts.  (Brydum Decl. ¶ 41).  None of the posts were posts that had been identified to ContextLogic previously.  (*Id.* at ¶ 42).

## II.    ARGUMENT.

A preliminary injunction is not meant as a vehicle to grant the plaintiff all the relief it seeks through its complaint without benefit of discovery or the opportunity for the parties to develop their respective cases.  As the Eleventh Circuit noted in *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297 (11th Cir. 2001):  "It is well established in this circuit that '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the 'burden of persuasion'' as to all four elements."  263 F.3d at 1300 (citations omitted).  No preliminary injunction is appropriate in this case because Venus has failed to meet this demanding standard as to any of the four elements that must be established to obtain a preliminary injunction.

Venus accuses ContextLogic of both direct copyright infringement and indirect copyright infringement under theories of contributory infringement and vicarious infringement.  These claims are without merit based on the facts set out above and the argument below.  Moreover, ContextLogic is not liable for any of the allegedly infringing conduct because it is subject to the safe harbor provisions contained in the DMCA, 17 U.S.C. § 512.  As a result, Venus has no likelihood of success on the merits of its claims and its application for preliminary injunction should be denied on that basis alone.

In addition, and well above and beyond what its obligations under the law may be, ContextLogic has already unilaterally taken steps that address the concerns of Venus, rendering Venus's demand for injunctive relief moot.  To the extent Venus were to demand still further action, that action would be beyond what is required of ContextLogic under the law, and would place a burden on ContextLogic that would grossly outweigh any benefit that might be received by Venus.  For all of these reasons, Venus's request for a preliminary injunction should be denied.

**A.      ContextLogic Does Not Directly Infringe Venus's Copyrights.**

To be liable for direct copyright infringement, the defendant must both "'actively engage in' and 'directly cause' the copying."  *Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1199 (N.D. Cal. 2004); *see also Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1168 (C.D. Cal. 2002) ("require[ing] that defendants . . . *actively* engage in one of the activities [prohibited] in the Copyright Act" to be held liable for direct copyright infringement (emphasis in original)).  In other words, a defendant cannot be held liable for direct copyright infringement based on copies of third-party submitted material that are automatically generated by a system that operates without human intervention beyond the initial set up and continual maintenance of that system.  *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1368 (N.D. Cal. 1995); *see also ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 622 (4th Cir. 2001) (when a service provider "serves, without human intervention, as a passive conduit for copyrighted material, it is not liable as a direct infringer"); H.R. Rep. No. 105-551(1), at 11 (1998) ("As

to direct infringement, liability is ruled out for passive, automatic acts engaged in through a technological process initiated by another.").

These principles were applied in *Religious Technology, supra*.  In that case the court addressed whether Netcom, an Internet access provider, could be held liable for direct copyright infringement where, based on Netcom's software, a third-party's initial act of posting a message resulted in the automatic copying of that message from the user's computer to Netcom's computer, and ultimately onto other computers on the Usenet (a worldwide community of electronic bulletin board services).  *Religious Tech.*, 907 F. Supp. at 1368.  Noting that Netcom "does not create or control the content of the information available to its subscribers" or "monitor messages as they are posted" the court found that Netcom was not liable for direct infringement because it "did not take any affirmative action that directly resulted in copying plaintiffs' works other than by installing and maintaining a system whereby software automatically forwards messages received from subscribers onto the Usenet, and temporarily stores copies on its system." *Id.*

In *Milo & Gabby, LLC v. Amazon.com, Inc.*, 2015 WL 4394673 (W.D. Wash., July 16, 2015), the Plaintiff accused Amazon.com of direct copyright infringement based on content a third-party placed on to Amazon.com's system offering for sale animal-shaped pillowcases.  Plaintiff claimed copyrights in the pillowcases and in website and marketing images depicting those pillowcases.  *Id.* at *1.  Plaintiff claimed that Amazon.com directly infringed these copyrights by allowing the third party to offer these products through Amazon.com's website and, in some instances, Amazon.com creating and distributing advertisements related to the allegedly infringing products.  *Id.* at *2.

In *Milo & Gabby*, as in the present case, the third-party sellers were responsible for the uploaded data and images and made those uploads without any intervention by Amazon.com.  In addition, the third-party sellers warranted that the products and images did not violate the intellectual property rights of others.  *Id.*  To the extent that Amazon.com advertised the products in dispute, its advertisements were generated "in an entirely automated manner."  *Id.* at *4.

The court granted summary judgment in Amazon.com's favor on Milo & Gabby's direct copyright infringement claims, holding that the facts of the case were "akin to those where software or hardware schemes automatically produce copies of the allegedly infringing images and the defendants do not actively participate in such activity."  *Id.* at *6.

Venus's direct copyright infringement claims fail for the same reasons that the claims of the plaintiffs failed in *Religious Technology* and *Milo & Gabby*.  In this case, as in those cases, the content Venus alleges to infringe its copyrights was uploaded by a third party without any active involvement on the part of ContextLogic.  As part of the process of uploading the content, the Merchant affirmatively represented that the content did not violate any third party's intellectual property rights.  To the extent the content was accessed once placed on ContextLogic's system, either by users browsing the content or by ContextLogic identifying the content in advertising, the process was wholly automated and involved no human intervention.  Consequently, ContextLogic's actions lack the requisite affirmative conduct needed to serve as a basis for a claim of direct copyright infringement against ContextLogic.  *Religious Tech.*, 907 F. Supp. at 1368, *Milo & Gabby*, 2015 WL 4394673 at *6.

The cases cited by Venus are wholly irrelevant to the facts of this case; they do not address this fact pattern, in which third parties are uploading data on to the defendant's computer system. *See MiTek Holdings, Inc. v. Arce Eng'g Co.*, 89 F.3d 1548 (11th Cir. 1996) (alleged copying of a computer program by a competitor); *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532 (11th Cir. 1996) (alleged copying of computer software); *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821 (11th Cir. 1982) (alleged infringement of soft sculpture dolls).

For all of these reasons, Venus has no likelihood of success on the merits of its claims of direct copyright infringement and, as a result, a preliminary injunction cannot be based on those claims. *Davidoff & CIE, S.A., supra.*

### B.   ContextLogic Is Not Liable for Contributory Copyright Infringement.

In order to be liable for contributory infringement Venus must establish that ContextLogic "(1) has knowledge of a third party's infringing activity, and (2) 'induces, causes, or materially contributes to the infringing conduct.'" *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,* 494 F.3d 788, 795 (9th Cir. 2007), *cert. denied,* 553 U.S. 1079 (2008). *See also, Cable/Home Commc'n. Corp. v. Network Prods.,* 902 F.2d 829, 845 (11th Cir. 1990) (same).

A computer system operator has the knowledge required to be contributorily liable if it "'has *actual* knowledge that *specific* infringing material is available using its system,' and can 'take simple measures to prevent further damage' to copyrighted works, yet continues to provide access to the infringing works." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007) (citations omitted, emphasis in original).   In the present case,

ContextLogic took measures, well beyond "simple measures," to prevent further damage to Venus by taking down the infringing material that Venus identified and putting in place a proactive system for identifying future potential infringement. (*See* Brydum Decl. ¶¶ 20-41). As a result, it is not liable for contributory copyright infringement, *Perfect 10, Inc.,* 508 F.3d at 1172, and no preliminary injunction can be based on claims of contributory infringement.

### C.      ContextLogic Is Not Vicariously Liable for the Infringement of Others.

To prevail on a claim for vicarious infringement, the plaintiff must prove "the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." *Perfect 10 v. Giganews, Inc.,* 2014 WL 8628031 at *3 (citing *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,* 494 F.3d at 802). In the context of an online marketplace, the "right and ability to supervise the infringing conduct" requires more than the mere ability to take down a particular post made by a third-party merchant. Rather the ability to control extends to the ability of the service provider to alter the third-party merchant's conduct. *Cf. Hendrickson v. eBay, Inc.,* 165 F. Supp. 2d 1082, 1093 (C.D. Cal. 2001) (mere ability to take down a post does not constitute sufficient control to take a service provider outside of the protections of the DMCA). Consequently, Venus's claims of vicarious infringement are without merit and any preliminary injunction cannot be based on those claims.

### D.      ContextLogic Is Immune from Any Liability for Copyright Infringement Under the Digital Millennium Copyright Act.

Even if there was some dispute that ContextLogic's activities might serve as a basis for a direct or indirect copyright infringement claim against ContextLogic, ContextLogic is

immune from liability under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512.  The DMCA was enacted to resolve the unique copyright enforcement problems caused by widespread use of the Internet.  *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1098 (W.D. Wash. 2004) (citing *Ellison v. Robertson,* 357 F.3d 1072, 1076 (9th Cir. 2004) and *In re Aimster Copyright Litigation*, 334 F.3d 643, 655 (7th Cir. 2003)).  Among other things, the Act was intended to balance the interests of copyright holders with those of service providers whose services may be used to infringe copyrights.  *Id.*

A copyright owner who suspects that her copyright is being infringed "must follow the notice and take down provisions set forth in § 512(c)(3) of the DMCA."  *Id.* (citing *Rossi v. Motion Picture Assoc. of America*, 391 F.3d 1000, 1003 (9th Cir. 2004)).  The notice must provide sufficient detail for the service provider to quickly identify the location on its system of the accused content.  *Viacom Int'l Inc. v YouTube, Inc.*, 940 F. Supp. 2d 110, 115 (S.D.N.Y. 2013) (goal of the DMCA notice provision "is to provide the service provider with adequate information to find and address the allegedly infringing material expeditiously").  Once properly notified, a service provider must "respond[] expeditiously to remove, or disable access to, the material that is claimed to be infringing."  *Corbis Corp.,* 351 F. Supp. 2d at 1098 (citing *Recording Industry Ass'n of America v. Verizon Internet Servs.*, 351 F.3d 1229, 1234 (D.C. Cir. 2003).  Only if the service provider fails to take down the potentially infringing material after proper notification is it outside the protections afforded by the DMCA and subject to claims of copyright infringement.

The DMCA, establishes a "safe harbor" that protect service providers from monetary and most equitable relief for which those providers might otherwise be liable if they meet

the requirements imposed upon them by the DMCA. *Id.* at 1098-99. An entity may claim these protections if it satisfies six elements, set out in 17 U.S.C. § 512(c), (i) and (k) and discussed below. ContextLogic satisfies each of the elements, as set forth below. As a result, it cannot be liable under Venus's claims of direct and indirect copyright infringement.

> 1. ContextLogic Is a Service Provider Under 17 U.S.C. § 512(k)(1)(b).

A "service provider" is defined as "a provider of online services or network access, or the operator of facilities therefor." 17 U.S.C. § 512(k)(1)(B). Entities such as ContextLogic, who offer online services to third-party merchants wishing to offer their products are "service providers" under the DMCA. *See Hendrickson v. eBay, Inc.,* 165 F. Supp. 2d at 1088 ("eBay clearly meets the DMCA's broad definition of online 'service provider.'"); *Corbis,* 351 F. Supp. 2d at 1100 ("there is no doubt that Amazon fits within the definition" of a service provider).

> 2. ContextLogic Has Adopted and Reasonably Implemented a Policy that Provides for Termination in Appropriate Circumstances.

ContextLogic satisfies the eligibility requirement set forth in 17 U.S.C. § 512(i)(1)(A) because it: (1) has adopted a policy for terminating access to its service for repeat copyright infringers; (2) informs its users of this policy; and (3) implements this policy in a reasonable manner.

*First*, ContextLogic has adopted a policy that provides for the termination of users of its system who are repeat infringers. A properly adopted infringement policy need only "convey to users that 'those who repeatedly or flagrantly abuse their access to the internet

through disrespect for the intellectual property rights of others . . . know that there is a realistic threat of losing that access.'" *Corbis*, 351 F. Supp. 2d at 1101 (ellipsis in original; internal quotation marks and citation omitted).  ContextLogic clearly conveys this message to third-party Merchants.  To list a product on the ContextLogic system, a third-party Merchant must agree to ContextLogic's Terms of Service, which includes a prohibition against violations of third parties' copyrights.  (Brydum Decl. ¶¶ 12-13).  Third-party Merchants accused of copyright infringement are sent a notice that informs the Merchant that its items have been accused of infringement.  (Chuang Decl. ¶ 21).  Accordingly, ContextLogic has established that it has adopted a policy for terminating a repeat infringer's access to the ContextLogic system.

*Second*, to adequately inform users of its termination policy, a service provider "need only inform users that, in appropriate circumstances, it may terminate the user's accounts for repeated copyright infringement."  *Corbis*, 351 F. Supp. 2d at 1102 (citing *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 659 (N.D. Ill. 2002), aff'd. 334 F.3d 643 (7th Cir. 2004) and *Perfect 10, Inc. v. CCBill, LLC*, 340 F. Supp. 2d 1077, 1088-89 (C.D. Cal. 2004)).  The service provider is not required "to reveal its decision-making criteria to the user."  *Id.*  As noted above, ContextLogic informs all third-party Merchants—via its Terms of Use and its Copyright Dispute Policy—that that access to the ContextLogic system may be denied if the third-party Merchant does not comply with all terms and conditions, including ContextLogic's policies concerning intellectual property infringement.  (Brydum Decl. Exs. A and B).  Further, ContextLogic notifies third-party Merchants who are accused of copyright infringement that they may be suspended from selling privileges on the

ContextLogic system due to repeated copyright infringement violations.  (Brydum Decl. Ex. C; Chuang Decl. ¶ 21).  These measures are sufficient to establish that ContextLogic has adequately informed its users of its termination policy for repeat copyright infringers.

*Third*, ContextLogic instructs users on how to make a claim if they believe that their copyright interest is being violated; they may do so via an online form or written submission by mail, fax, or email.  (*See* Brydum Decl. Ex. C).  ContextLogic's practice involves removal of product offerings upon adequate notice that the offering violates another's intellectual property rights.  (Brydum Decl. ¶¶17-19).  Upon removing such offerings, ContextLogic sends the third-party Merchant a message informing the seller that the offering may have violated the intellectual property rights of others.  (Chuang Decl. ¶ 21).  ContextLogic also warns the third-party Merchant that repeated violations may result in permanent suspension from the ContextLogic system.  (*See* Brydum Decl. Ex. C).  These measures are sufficient to establish that ContextLogic reasonably implements a policy for terminating repeat copyright infringers.  *See Corbis*, 351 F. Supp. 2d at 1102-06 (concluding that Amazon reasonably implements its copyright infringement policy).

3. ContextLogic Does Not Interfere with Standard Technical Measures.

ContextLogic satisfies the DMCA eligibility requirement set forth in 17 U.S.C. § 512(i)(1)(B) as it does not interfere with standard technical measures used to identify and protect copyrighted works.  The DMCA defines the term "standard  technical measures" as "technical measures that are used by copyright owners to identify or protect copyrighted works" and (a) "have been developed pursuant to a broad consensus of copyright owners

and service providers in an open, fair, voluntary, multi-industry standards process," (b) "are available to any person on reasonable and nondiscriminatory terms," and (c) "do not impose substantial costs on service providers or substantial burdens on their systems or networks." 17 U.S.C. § 512(i)(2).   Here, Venus has not identified and cannot identify any standard technical measure used to identify or protect a copyright interest held by Venus, much less demonstrate that ContextLogic has somehow interfered with such measures.   Absent evidence that ContextLogic interferes with standard technical measures, this element is satisfied.   *See Corbis*, 351 F. Supp. 2d at 1106 (holding threshold condition of not interfering with technical measures established where the plaintiff did not challenge Amazon's assertion of compliance with 17 U.S.C. § 512(i)).

        4.   ContextLogic Did Not Have Actual or Apparent Knowledge of the Alleged Copyright Infringement Upon Which It Did Not Act Promptly.

A service provider may not rely upon the safe harbor of the DMCA if it has actual or apparent knowledge of an alleged copyright infringement but fails expeditiously to remove or disable access to the infringing material upon receiving knowledge of that material.   17 U.S.C. § 512(c)(1)(A)(i)-(iii).   Under the DMCA, a notification from a copyright holder that fails to comply substantially with the notice provisions of Section 512(c)(3) of the DMCA "shall not be considered under Section (A)(i) in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent."   17 U.S.C. § 512(c)(3)(B)(i).   Moreover, the burden of providing adequate notice lies squarely on the shoulders of the copyright holder.   *See, e.g., UMG Records, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006, 1022 (9th Cir. 2013) ("Congress made a

considered policy determination that the 'DMCA notification procedures [would] place the burden of policing copyright infringement – identifying the potentially infringing material and adequately documenting infringement – squarely on the owners of the copyright.'"). Thus, the adequacy of the copyright holder's notice to the service provider is key in identifying the scope of knowledge imputed to ContextLogic.

In two instances, Venus has provided ContextLogic with information concerning alleged infringements that includes the URLs or other information reasonably sufficient to allow ContextLogic to identify the potentially infringing posts on ContextLogic's system. As discussed below, and pursuant to the requirements of 17 U.S.C. § 512(c)(1)(C), ContextLogic has acted expeditiously to remove or disable access to those posts.

In addition, though, Venus has made vague allegations of copyright infringement unaccompanied by the "information reasonably sufficient to permit the service provider to locate the material" required under 17 U.S.C. § 512(c)(3)(A)(iii). Specifically, in his communications with ContextLogic, Mr. Charfoos has made the broad demand that ContextLogic take down images based on screenshots that do not contain reasonably sufficient information to identify the third-party Merchant posts at issue. (*See* letter, Dkt. 2-15 at 3-17). When asked for additional information, he provided some additional information concerning certain posts (information that was acted upon by ContextLogic) but concluded: "we believe that the screenshots should provide you with sufficient information to identify the infringing images." (Dkt. 2-16 at 7).

Vague claims such as this do not serve as sufficient notice under the DMCA that would impute knowledge of alleged infringements to ContextLogic, taking ContextLogic

outside of the safe harbor established by the DMCA. For example, in *Perfect 10, Inc. v. Giganews, Inc.*, 2014 WL 8628031 (C.D. Cal. Nov. 14, 2014), the copyright holder provided defendant with screenshots and a demand that defendant conduct its own searches to identify the allegedly infringing materials. *Id.* at *8. The court held, on summary judgment, that these screenshots failed to provide the actual and constructive knowledge to defendant needed to trigger liability for copyright infringement. *Id.* at *9-10.

In *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082 (C.D. Cal. 2001), Hendrickson put eBay on notice that allegedly infringing copies of his movie, "Manson," were on sale on eBay. When eBay asked for more detail, Hendrickson contended "that it is not his job to do so once he has notified eBay of the existence of infringing activity by eBay sellers." 165 F. Supp. 2d at 1090. On summary judgment, the court held that generalized claims such as those provided by Hendrickson were not sufficient to compel eBay to take down any listings, and that eBay's failure to act on those claims was protected by the safe harbor provisions of the DMCA. *Id.* at 1090-1093.

Similarly, in this case generalized claims of copyright infringement by Venus, unaccompanied by reasonably sufficient information for ContextLogic to identify the specific posts about which Venus is complaining, are insufficient to put ContextLogic on notice of alleged copyright infringement. *Perfect 10, Hendrickson, supra*. As a result, ContextLogic is subject to the protections afforded it under the DMCA and is not liable for any of Venus's copyright infringement claims based on notices of infringement that do not comply with the requirements of the DMCA. *Id.*

5. ContextLogic Acted Expeditiously to Remove Allegedly Infringing Material in Response to Venus's Complaints.

In two interactions with ContextLogic in March and May of this year, Venus has provided ContextLogic with information sufficient for ContextLogic to identify specific post containing allegedly infringing material. (*See* Brydum Decl. at ¶¶ 20-27). In those instances, ContextLogic acted expeditiously to take down those posts. *Id.* As a result, ContextLogic has met the obligations placed on it under 17 U.S.C. § 512(c)(1)(A)(iii), is protected by the safe harbor provisions of the DMCA, and is not liable for copyright infringement.

Venus contends that ContextLogic has failed to take down advertising or promotional materials containing an allegedly infringing image after it has provided notification to ContextLogic. (Dkt. 2 at 13). This is not correct. To the extent email advertising or external advertising may take place, advertising containing an image from a post which has been removed at the request of Venus is also removed promptly for any advertising purposes. (Xie Decl. at ¶ 10). For all of these reasons, ContextLogic has met the requirements placed on it under 17 U.S.C. § 512(c)(1)(A)(iii) and is subject to the protections afforded it under the DMCA.

6. ContextLogic Lacks the Ability to Control the Allegedly Infringing Activity Complained of by Venus.

The safe harbor provisions of the DMCA do not apply if the service provider "receive[s] a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B). This "right and ability to control such activity" does not extend to the mere

ability to block or disable a post. "To hold otherwise would defeat the purpose of the DMCA and render the statute internally inconsistent." *Hendrickson*, 165 F. Supp. 2d at 1093. Rather, the "right and ability to control such activity" means the right and ability to control sales of the allegedly infringing items themselves.

ContextLogic has no such right or ability. As with the transactions at issue in *Hendrickson*, ContextLogic is not actively involved in the listing, bidding, sale or delivery of any items offered for sale through its system. It never possesses any of the items at issue, nor is it involved in the shipment of those items. Thus, ContextLogic does not have the right or ability to control the activity of its third-party Merchants such that it could be liable for their actions. *Hendrickson*, 165 F. Supp. 2d at 1094.

For all of these reasons, ContextLogic has met all of the requirements set out in 17 U.S.C. § 512(c) and, as a result, is not liable for copyright infringement based on its activities alleged in Venus's complaint. Consequently, a preliminary injunction should not be entered because Venus cannot establish a likelihood of success on the copyright claims it has brought against ContextLogic. *See Davidoff & CIE, S.A.*, 263 F.3d at 1300 (preliminary injunction should be entered only upon movant clearly establishing its burden of persuasion on all four elements that must be met for entry of an injunction).

### E.     ContextLogic Has, By Its Unilateral Actions, Mooted the Need for a Preliminary Injunction.

As established through the Brydum Declaration (¶¶ 20-27), ContextLogic has acted expeditiously to disable specific posts that allegedly infringe on Venus's copyrights when it has been provided sufficient information to identify the posts and take them down. There is no need for an injunction in this regard.

Venus also demands an injunction that "require[s] that Wish modify the Wish algorithm to prevent any further infringement by Wish." (Dkt. 2 at 24). To the extent this would reach use in advertising and promotions of images from posts that have been taken down or disabled, ContextLogic's system already acts to prevent use of these images after the underlying posts have been disabled. (Xie Decl. ¶ 10). Thus, there is no need for an injunction in this regard.

Although not clear, Venus appears to seek an injunction that would require ContextLogic to monitor its system prospectively to identify future posts that might include images infringing on Venus's copyrights. Such a demand is contrary to the law. For example, in *Hendrickson v. Amazon.com, Inc.,* 298 F. Supp. 2d 914 (C.D. Cal. 2003), the plaintiff contended that a broad notice claiming that all listings for a particular movie would infringe his copyright imposed on Amazon.com an obligation of taking down all future posts offering that movie. The court rejected this argument, holding that the DMCA imposed on a service provider the obligation to search for infringing content on its system at the time the take-down notice was received, but not to search for potentially infringing content in the future. 298 F. Supp. 2d at 917.

Even though ContextLogic has no obligation to take down posts that did not exist at the time it received a take-down notice from Venus, it has put in place the software described by Mr. Xie in his declaration and has, using that software, affirmatively removed over 17,000 posts that appeared to incorporate the same Venus images that were the subject of previous posts. As a result, ContextLogic has already addressed any Venus demands for future action, mooting that portion of its demand for injunctive relief.

**F.**       **Venus's Evidence of Alleged Irreparable Harm Is Slight and Indirect.**

ContextLogic has, pursuant to its unilateral actions, taken down over 17,000 posts that appeared to incorporate images in which Venus alleges to hold copyrights.  Upon being informed of additional alleged infringements, via email and through Venus's preliminary injunction filings, ContextLogic has disabled the posts containing those images.  (Brydum Decl. ¶ 41).  Thus, Venus's claims that rampant copyright infringement will occur if an injunction is not entered (*see* Dkt. 2 at 22) are demonstrably incorrect.

Venus also suggests that use of the allegedly infringing images at issue in this lawsuit by third-party Merchants has caused it lost sales and a loss in reputation.  (Dkt. 2 at 23).  Yet, it has neither connected the highly excerpted Facebook posts that it included as part of its filings (Dkt. 2-11) with any lost sale of the products depicted in those images, nor has it connected those Facebook comments with any of the allegedly copyrighted images. In short, Venus seeks to support its claim of irreparable harm with nothing more than innuendo.

**G.**       **The Balance of Harms Tips Strongly in ContextLogic's Favor.**

ContextLogic has, of its own volition and before this lawsuit was instituted, taken steps to address the concerns raised by Venus.  To the extent that the Court were to order ContextLogic to take further action, particularly action that would cause significant disruption to ContextLogic providing its services on an ongoing basis in regard to posts not challenged by Venus, that order would impose extraordinary hardship on ContextLogic. (*See* Chuang Decl., ¶¶ 23).    *Cf. Davidoff & CIE, S.A.*, 263 F.3d at 1304 (injunction appropriate because it only reached allegedly infringing conduct and did not prevent

defendant from continuing to offer non-infringing goods).  To the extent the Court were to order ContextLogic to alter its existing software in a particular fashion, that order, too, would force significant expenses on ContextLogic.  (Chuang Decl. ¶ 25)   These expenses far outweigh the potential harm to Venus in proceeding under the current system.

In addition, ContextLogic notes that Venus has demanded, as part of its relief, that the Court prevent ContextLogic from transferring assets and freeze its accounts.  (Dkt. 2 at 27).  A draconian measure such as this is wholly unwarranted under the facts of this case. *Cf. Reebok Int'l Ltd. v. Marnatech Enters., Inc.*, 737 F. Supp. 1521, 1524 (S.D. Cal. 1989) (injunction entered prohibiting transfer of assets in light of extensive evidence of the sale of counterfeit REEBOK apparel "and apparent fraudulent financial dealings in connection therewith"), *aff'd sub nom. Reebok Int'l v. Marnatech Enters., Inc.*, 970 F.2d 552 (9th Cir. 1992).   There is no such evidence here.   Moreover, such an order would prevent ContextLogic from doing business, costing almost 150 jobs and destroying a company with a market value in excess of $100 million.   (Chuang Decl. ¶¶ 23 and 24).  As a result, an injunction freezing ContextLogic's accounts or imposing restrictions on its financial activity would cause disproportional harm to ContextLogic and should not be entered.[1]

---

[1] Venus also seeks an order prohibiting ContextLogic from transferring the domain name www.wish.com.  There is no evidence that ContextLogic was considering such a transfer, and Mr. Chuang has stated that ContextLogic is not even considering such a transfer. (Chuang Decl. at ¶ 7).   As a result, no order on that element of relief is needed or appropriate.

**H.**     **The Public Interest Would Be Disserved By an Injunction That Resulted in ContextLogic's Services Being Denied to Those Who Were Not Using the Services for Infringing Purposes.**

Approximately 71.8 million different items are available on ContextLogic's Wish App and Wish Website on any particular day.  (Chuang Decl. ¶ 16).  Venus claims to have identified approximately 100 images that it found on the www.wish.com website on July 6-8 and that allegedly infringe on Venus copyrights.  (Dkt. 2-1 at 2, ¶ 11).  Clearly, ContextLogic's service is not merely making available for review posts that may infringe Venus's copyrights.

ContextLogic has 155 million users.  Those users have a right to review non-infringing material and transact business with third-party Merchants who are not infringing on any alleged intellectual property rights of Venus.  An order that resulted in ContextLogic being prevented from offering its services to Merchants and users unrelated to the images at issue in this case would be against the public interest.  *Cf. Apple, Inc. v. Samsung Electronics Co., Ltd.*, 735 F.3d 1352, 1373 (Fed. Cir. 2013) (court may consider impact on the public of depriving the public of access to non-infringing features in tailoring the scope of injunctive relief).  This would extend to an order that hindered the overall business of ContextLogic, and an order that impacted the display of posts that did not contain any of Venus's allegedly copyrighted images.

**I.**     **Venus's Proposed Bond Amount Is Wholly Inadequate in the Event Injunctive Relief Were Granted.**

Venus has proposed a bond of $10,000.00.  (Dkt. 16 at 2).  This amount is wholly inadequate if the Court were to enter an injunction that froze ContextLogic's assets or had a material impact on ContextLogic's ability to do business.  (*See* Chuang Decl. at ¶¶ 23 and

24).  A bond of at least $100,000,000.00 would be necessary if the Court were to conclude that such an injunction was appropriate.  *See* Fed. R. Civ. P 65(c) (security required from party seeking injunction should be "in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained").

## III.    CONCLUSION.

For the reasons set out above, Venus's application for preliminary injunction should be denied.

Respectfully submitted this 3rd day of August, 2016.

DURANT, SCHOEPPEL,
DECUNTO & RATCHFORD, P.A.


s/ Dwight D. Lueck_____
C. Popham Decunto (Trial Counsel)
Florida Bar No. 0650021
Email:  pdecunto@ds-law.net
Stephen H. Durant
Florida Bar Number: 180050
Email: sdurant@ds-law.net
6550 St. Augustine Rd., Suite 105
Jacksonville, Florida 32217
(904) 652-2600; (904) 652-2010 Fax

Dwight Lueck (IN #14294-49)
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, IN  42604-3535
Telephone:  317-236-1313
Facsimile: 317-231-7433
Email:  Dwight.Lueck@btlaw.com
*Pro Hac Vice*

*Attorneys for Defendant, Contextlogic, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 3, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Aaron D. Charfoos, Esquire, Allan Gabriel, Esquire, David E. Otero, Esquire, and Peter A. Chiabotti, Esquire, *Attorneys for Plaintiff*, at acharfoos@dykema.com, agabriel@dykema.com, david.otero@akerman.com, and peter.chiabotti@akerman.com.

s/ Dwight D. Lueck
Attorney

DMS 4208013v4