**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

VENUS FASHIONS, INC.,

      Plaintiff,

vs.                                Case No. 3:16-cv-907-J-39MCR

CONTEXTLOGIC, INC.,

      Defendant.

_____

## ORDER GRANTING PRELIMINARY INJUNCTION

This copyright infringement case involving copyrighted fashion photographs appearing without permission on an online service provider's website and promotional material, is before the Court on Plaintiff's Application for Preliminary Injunction, filed with its Complaint on July 14, 2016. (Doc. 1; Complaint); (Doc. 2; Motion). In support of the Motion, Plaintiff Venus Fashion, Inc. ("Venus") relies on declarations and exhibits filed with its Motion and Reply (Doc. 32). Defendant ContextLogic, Inc. ("ContextLogic") has filed a response in opposition accompanied by declarations and exhibits. (Doc. 25); (see also Doc. 37). The Court heard argument of counsel for the parties on the pending motions during a hearing on August 17, 2016, the record of which is incorporated herein.[1]

---

[1] Also pending is Defendant ContextLogic's Motion to Take Judicial Notice, filed on August 15, 2016. (Doc. 35; Motion to Take Judicial Notice). ContextLogic requests that the Court take judicial notice of the Declaration of Vishal Shanbag submitted by Amazon.com in support of its motion for summary judgment in the case Milo & Gabby, LLC v. Amazon.com, Inc., No. C13-1932RSM, 2015 WL 4394673, at *1 (W.D. Wash. July 16, 2015). Id. at 1. Counsel for Venus stated at the hearing that Plaintiff has no objection to the Motion for Judicial Notice. (Doc. 40; Tr. at 35-37). The Court may consider the record in previous cases to clarify the meaning of court orders. See Wagner v. Daewoo Heavy Indus. Am. Corp., 289 F.3d 1268, 1274 n.7 (11th Cir.), vacated on different grounds, 298 F.3d 1228 and 314 F.3d 541 (11th Cir. 2002); see also United States v. Glover, 179 F.3d 1300, 1302 n. 5 (11th Cir.1999) ("[G]iven the lack of clarity about the facts, we have looked at the record before the court in [a previous case], not to contradict the court's opinion, but only to clarify the meaning of its words."); United States v. Rey, 811 F.2d 1453, 1457 n. 5 (11th Cir.1987) ("A court may take judicial notice of its
(continued...)

(Doc. 38, 40). On August 18, 2016, following the hearing, the Court directed the parties to provide specific information, with citations to the record, regarding notice and take-down history, and technology. (Doc. 39; 08/18/16 Order). In response, the parties submitted supplemental briefing and exhibits. (See Docs. 44, 45, 53, 54).

## I.    Standard of Review

The Court is authorized to enter a preliminary injunction by Rule 65, Federal Rules of Civil Procedure. "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." Ne. Fl. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fl., 896 F.2d 1283, 1284 (11th Cir.1990). The Copyright Act specifically vests the federal courts with power to grant injunctions "to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). Injunctive relief may be particularly appropriate in cases involving simple copying or "piracy" of a copyrighted work. Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1265 (11th Cir. 2001) (citing Campbell v. Acuff–Rose Music, Inc., 510 U.S. 569, 578 n. 10 (1994)).

To prevail on their request for injunctive relief, Plaintiffs must demonstrate: "(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest."

---

[1](...continued)
own records and the records of inferior courts."); Fed. R. Evid. 201(b)(2) and (c)(2). The Court may take judicial notice at any stage of the proceeding. Bobadilla v. Aurora Loan Servs., LLC, 478 F. App'x 625, 627 (11th Cir. 2012); Fed. R. Evid. 201(d). The Motion for Judicial Notice is due to be granted.

Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1246-47
(11th Cir. 2002); see also CBS Broad., Inc. v. EchoStar Commc'ns Corp., 265 F.3d 1193,
1200 (11th Cir. 2001).  A preliminary injunction is a drastic and extraordinary remedy
which should not be granted unless the movant can clearly establish each of the four
elements.  America's Health Ins. Plans v. Hudgens, 742 F.3d 1319, 1329 (11th Cir.
2014).  "The burden of persuasion on all of the four requirements for a preliminary
injunction is at all times upon the plaintiff."  Canal Auth. of Fl. v. Callaway, 489 F.2d 567,
573 (5th Cir. 1974).[2]  The failure to establish an element, such as a substantial likelihood
of success on the merits, will warrant denial of the request for preliminary injunctive relief
and obviate the need to consider the remaining prerequisites.  See Pittman v. Cole, 267
F.3d 1269, 1292 (11th Cir. 2001) (citing Church v. City of Huntsville, 30 F.3d 1332, 1342
(11th Cir. 1994)).  In considering a motion for preliminary injunctive relief, "a district court
may rely on affidavits and hearsay materials which would not be admissible evidence for
a permanent injunction, if the evidence is appropriate given the character and objectives
of the injunctive proceeding."  Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d
982, 985 (11th Cir. 1995) (internal quotation marks and citation omitted).

## II.  Facts

This recitation of facts is derived from the evidence submitted by the parties.  At
this stage of the proceedings, the evidence is relatively bare bones for a case such as
this.

---

[2]  In Bonner v. City of Prichard, Alabama, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh
Circuit adopted as binding precedent decisions of the former Fifth Circuit rendered prior to October 1,
1981.

A.    **Background**

Founded in 1982, Plaintiff Venus is a company that designs and creates women's clothing and bathing suits. (Doc. 2-1; Sheffler Decl. ¶¶ 2, 3). Venus sells its products online at its registered site, and in a catalog sent to Venus subscribers. Id. ¶ 5. In order to market and promote its products, Venus has created photographic images of its products ("Images"), which depict female models wearing the apparel. The Images are posted on Venus's website and are included in its catalog. Id. ¶¶ 6, 7. Venus has obtained copyrights for all of the Images that appear on its website and in its catalog, Id. ¶ 8, having copyright registrations for 5,411 Images. (See Doc. 37-1 at 3). The copyrighted Images do not have a copyright notice stamp on them and they are not so-called "iconic" images, but rather are photographs of women modeling swimsuits and other articles of women's clothing (which are not copyrighted). The copyrights were registered on February 23, 2016 and April 14, 2016. Sheffler Decl. ¶ 9; (see also Docs. 2-3 to 2-9). ContextLogic does not have the right or authority to use the copyrighted images. Sheffler Decl. ¶ 10.

Defendant ContextLogic was founded in 2010 and has its offices in San Francisco, California. (Doc. 25-2; Chuang Decl. ¶ 4). Defendant ContextLogic operates a website located at www.wish.com (the "Wish Website"), and also operates through an application that can be downloaded for free on to on a user's cell phone under the mark WISH (the "Wish App"). (Doc. 25-1; Brydum Decl. ¶ 5); Chuang Decl. ¶¶ 6, 8. More than 155 million users have downloaded the Wish App, and have registered as Wish users. Chuang Decl. ¶ 9. The Wish Website provides an online and mobile shopping marketplace. (Doc. 2-2; Charfoos Decl. ¶ 2); see also (Doc. 2-13 at 2). Third-party

4

sellers ("Merchants") offer products through posts that may be accessed through the Wish App and the Wish Website.  Brydum Decl. ¶ 6; Chuang Decl. ¶ 10; Charfoos Decl. ¶ 3; see also (Doc. 2-14 at 2).

> ContextLogic does not post items available for sale.  All postings, including any images included in these postings, are made by third party Merchants.  Those Merchants are responsible for their posts, including the images included in any post.

Chuang Decl. ¶ 12.  ContextLogic characterizes itself as a "facilitator, receiving a commission for facilitating the transaction between the Wish App user and the Merchant." Id. ¶ 13; (see also Doc. 25-1 at 13; Terms of Service § 3 ("Wish will either take a percentage or a set amount of the sale price when the item sells.")).  ContextLogic does not take possession of the products offered by Merchants nor does it ship the items to purchasers.  Chuang Decl. ¶ 14.

ContextLogic currently has approximately 110,000 Merchants that are posting items for sale.  There are approximately 71.8 million items available through the Wish App or the Wish Website, and approximately 490,000 items are added each day. Chuang Decl. ¶¶ 15-17.  All Merchants are subject to ContextLogic's Terms of Service, which includes a prohibition of copyright infringement.  Brydum Decl. ¶¶ 7, 8, 9, 10; see also (Doc. 25-1 at 11).  ContextLogic has a copyright infringement policy, called "Wish Copyright Dispute Policy."  Brydum Decl. ¶ 9; (Doc. 25-1 at 23).  ContextLogic maintains a nine person Content Management Team to respond to and analyze "take-down" requests and to monitor new posts.  Chuang Decl. ¶ 19; (Doc 25-4; Kuntz Decl. ¶ 10). "ContextLogic has software in place that takes the post at issue down almost immediately after a request from the content management team."  Kuntz Decl. ¶ 11.  When a post is

taken down the third-party Merchant receives a notice of the take-down.  Chuang Decl. ¶

21.  A Merchant Support Team is also notified of the "take-down."  Id. ¶ 20.  A third-party

Merchant may dispute the "take-down" to the Content Management Team.  Id. ¶ 22.

Each product sold through the Wish App or the Wish Website has its own "product

detail page," which is specific to the product, and associated with a unique Uniform

Resource Locator, commonly called a "web address" or "URL".  Brydum Decl. ¶ 11.

> 12.    When a Merchant wants to offer a new product for sale
> through the Wish App or the Wish Website, the Merchant is
> responsible for sending ContextLogic, via an automated file
> upload system, content related to the product.  The submitted
> content is used to create the "product detail page" for the new
> post via an automated process.
>
>                              . . .
>
> 14.    ContextLogic's role with respect [to] third-party
> Merchant offerings and content uploaded by the Merchant is
> limited and passive.  ContextLogic does not suggest prices for
> products, does not provide images the Merchant may use in
> promoting its products, or involve itself in third party sales
> except to set parameters on terms and conditions of use.

Brydum Decl. ¶¶ 12, 14; (see also Doc. 25-3; Xie Decl. ¶ 3 ("The submitted content is

used to create the 'product detail page' for the new post via an automated process.")).

In addition to displaying photographs on its website, "Wish also uses the

photographs in various promotional material including in emails directly sent to customers

or potential customers, banner ads, Facebook listings, other social media outlet and on

its logon screen."  Charfoos Decl. ¶¶ 4, 5, 6; see also Kuntz Decl. ¶ 8 ("Elements of the

uploaded data may also be used as parts of advertisements or reminders.").

> 5.    ContextLogic seeks to provide its users with product
> offerings that are tailored to meet the interests of those users.
> To do so, one form of advertising that ContextLogic uses in
> certain circumstances is email advertising.  When a

6

ContextLogic user browses on the Wish App or the Wish Webpage, ContextLogic may retain various pieces of information related to that customer's browsing session. Based on that information, ContextLogic uses an algorithm to select advertising that is targeted to that particular user. The selected advertisement may then be sent via email advertisement to display, for example, products that the user viewed but did not purchase during the browsing session.

6.      This entire process - including the selection of the content to be delivered to the user through the advertisement - is completely automated.

Xie Decl. ¶¶ 5, 6.  The user can then click on the image in the email and will be directed to the Wish Website which will show the same item.  Id. ¶ 7.  "[T]he process for selecting images shown on the [customer's log in page] splash screen is completely automated, and is guided by the previous activities of the user of the app or webpage."  Id. ¶ 7.

Finally, ContextLogic contracts with other website operators and online advertising exchanges to display product advertisements on those websites.  "These advertisement often relate to products that are offered for sale through the Wish App or the Wish Website," using automated proprietary algorithms to select product offerings in accordance with targeted age, gender an geographic demographic groups.  Xie Decl. ¶¶ 8, 9, 10.

If a product post is taken down for some reason, including potential copyright infringement issues, ContextLogic has a procedure in place that will cause the advertising promotion of the post and its content "to cease almost immediately."  Xie Decl. ¶ 10. ContextLogic also notifies advertisers and third-party websites daily of advertising and posts that are no longer to be used because the Wish post has been taken down.  Id. ¶ 10.

ContextLogic operates a Brand Partner Program. Brydum Decl. ¶ 15; (Doc. 25-1 at 30); Chuang Decl. ¶ 18. However, an intellectual property owner is not required to participate in the Brand Partner Program, and may assert its rights by communicating with ContextLogic through an email support system or other means. Brydum Decl. ¶ 16.

> If a product listed is determined to be counterfeit, or the listing is in violation of third-party intellectual property, ContextLogic may block the listing or block the seller. Blocked sellers are not allowed to open a new account or post new products.

Brydum Decl. ¶ 18. "When ContextLogic received [sic] notice of claimed infringement it strives to take appropriate action within 12-24 hours, and on average no more than 48 hours." Id. ¶ 19.

## B.    Communications Between Venus and ContextLogic

ContextLogic received requests to investigate allegations of infringement from Venus on two occasions, first in March 2016, and then in May-June, 2016. Brydum Decl. ¶ 20. Venus first learned in March 2016 that replicas of its Images were being displayed on the Wish Website. Sheffler Decl. ¶ 14. On March 21, 2016, Venus, through staff on behalf of Controller Robin Sheffler, sent an email to Brand-Protection@Wish.com "notifying Wish that its website had photographs which appeared to be identical to one of Venus's copyrighted images and identifying the copyright registration number . . . ." Id. ¶ 15. Elisa Brydum, Content Manager of ContextLogic ("Brydum"), responded, and several email exchanges followed between March 21, 2016 and March 30, 2016. Id.; see also (Doc. 2-12).

Specifically, Venus's March 21, 2016 e-mail stated that Venus had been "advised" that Wish was "using many of our images on your website." (Doc. 2-12 at 3, 6). The

8

correspondence certified that Controller Robin Sheffler was authorized to act on behalf of

Venus, id. at 6, 8, stated Venus's copyright registration number for "many of these items,"

id. at 6, and attached "some of the images that we have found on wish.com." Id. The

record reflects that Venus provided ContextLogic seven pages of Images with seven URL

addresses for allegedly infringing Images, and that the remaining Images were variants of

the main Image noticed with the URL address. (See Doc. 2-12 at 9-15). There was also

a one-page document with a handwritten notation "wish.com" that says:

> [I]t is Wish's policy to respond to alleged infringement notices
> that comply with the Digital Millennium Copyright Act of 1998
> ("DMCA").
>
> . . .
>
> Once a proper, bona fide infringement notification is received,
> it is our policy:
>
> •   To remove or disable access to the infringing material;
>
> •   To notify the content provider, member or user that we
>     have removed or disabled access to the material;
>
> •   That repeat offenders will have the infringing material
>     removed from the system and that we will terminate
>     such content provider's, member's or user's access to
>     the Wish.

(Doc. 2-12 at 7) (including the DMCA requirements for notification).

Brydum responded on March 21, 2016, three hours later stating: "These links have

been removed." (Doc. 2-12 at 2, 5); see also Brydum Decl. ¶ 23 (ContextLogic "promptly"

took down seven identified posts.). ContextLogic invited Venus to become a "brand

partner in order to combine efforts with Wish to remove counterfeits," representing that

the "brand partner" program "will accelerate the take down request process." (Doc. 2-12

at 5).

9

On March 24, 2016, Venus responded thanking Brydum "for removing the links
that we requested," and stating that Venus had found "additional Venus copyrighted
images on your website," indicating that the unspecified number of copyrighted images
were enclosed as an attachment).  (Doc. 2-12 at 2, 5).  Brydum responded on March 30,
2016 that Wish had removed the links, and again invited Venus to become a Brand
Partner.  (Doc. 2-12 at 2); see also Brydum Decl. ¶ 23 (ContextLogic "promptly" took
down the nine additional identified posts.).

On June 1, 2016, Venus's counsel of record Aaron Charfoos ("Charfoos"), emailed
a letter to Brydum at ContextLogic, which resulted in a correspondence exchange
between Charfoos and Brydum between June 1 and June 3, 2016.  Charfoos Decl. ¶ 7, 8;
Brydum Decl. ¶ 24.  In the June 1, 2016 letter, Charfoos wrote:

> Venus has recently learned that Wish.com (which is
> developed and operated by ContextLogic LLC), and
> Wish.com's suppliers, have copied many of the Images
> directly from Venus, in a number of cases multiple times, and
> unlawfully displayed the Images on Wish.com's website . . . on
> Facebook, on its app, on the iTunes store and in other
> locations. . . . In addition it also appears that Wish.com, and
> its suppliers, have altered some Images. . . .
>
> We have included copies of screen shots on which
> Wish.com displays the copyrighted Images belonging to
> Venus.

(Doc. 2-15 at 3).  Charfoos wrote that Venus had

> previously notified Wish.com's Elisa Brydum that it was
> infringing on Venus's intellectual property rights . . . .  Despite
> this notice, Wish.com continues to display, and continues to
> allow its suppliers to display, the very Images that Venus
> previously identified - and many more.

Id.  Charfoos wrote that this unauthorized display of Venus's Images constitutes

"copyright infringement and contributory copyright infringement," and demanded that

Wish "[c]ease and desist" from any further unauthorized use of Venus's copyrighted

materials; remove and destroy all such Images; provide the names and contact

information for third parties who supplied said Images, and "[p]rovide an accounting of all

proceeds and profits from your sale of Wish.com incorporating the Images depicted by

the copyrighted works." Id. at 3-4. Attached to Venus's Exhibit is a collection of

photographs appearing in apparent screenshots from Wish.com, the Wish App;

Facebook, the Wish sign-in page, and sample email promotion. A number of the

screenshots include the URL web address (though the addresses are barely legible in the

exhibit on file with the Court). (See Doc. 2-15 at 6-17).

According to ContextLogic, each post identified by Charfoos on June 1, 2016 "was

a post that was different from any of the posts identified" by Venus in March, 2016.

Brydum Decl. ¶ 25.

Brydum responded to Charfoos on June 1, 2016, stating that:

> [u]nfortuntately, without the full addresses of these reported
> products I can't find the listings and take them down. Could
> you please supply me with the exact address of those items?
> The addresses in the screenshots are not complete.

(Doc. 2-16 at 8). She again invited Venus to participate in the Wish Brand Partner

Program to facilitate the take-down of allegedly infringing material. Id. "In each case in

which the Venus representative provided a URL to connect the allegedly infringing

photograph with a specific post, that post was taken down by ContextLogic," in most

cases within a matter of hours, and in two cases, within 24 hours. Brydum Decl. ¶ 26.

Locating posts "is not an easy task," because "ContextLogic currently has tens of

thousands of merchants who have posted millions of items that are currently available

through the Wish App or the Wish Website at any one time." Id. ¶ 29. ContextLogic was

able to use the "screenshots" provided by Venus, and "in all but two instances, was able

to identify the corresponding post and take that post down promptly." Id. ¶ 30.

Charfoos wrote back on June 1, 2016 that Venus does

> not have the complete website address for all of the pictures
> we included, but we believe that the screenshots should
> provide you with sufficient information to identify the infringing
> images. Nevertheless, we were able to obtain the following
> addresses for some of the infringing products we listed in our
> letter.

(Doc. 2-16 at 7 (listing six web addresses)). Charfoos wrote:

> Unfortunately, we are concerned that simply taking down the
> infringing pictures and becoming a brand partner will not be,
> and have not been, sufficient steps to prevent further
> infringement by Wish.com. As we detailed earlier in our letter,
> a number of copyrighted Images have been on Wish.com's
> website since March 2016 despite earlier correspondence
> from Venus to you requesting that they be removed.

Id. Charfoos requested that Wish respond to Venus's demands and particularly identify

who is actually posting the infringing images on Wish.com's website. Id. at 8.

Brydum with ContextLogic responded on June 1, 2016 that Wish is

> currently building a catalog of images based on [Venus's]
> previous takedown requests. Using those images,
> [ContextLogic] is creating an image match system that will
> finger print the images and automatically prevent merchants
> from uploading those products again. We are excited for the
> upcoming launch of this feature and hope that it will further
> positive relationships with you and other brand owners.

(Doc. 2-16 at 4-5). Also, on June 1, 2016, Brydum provided Venus with contact

information for the six listings provided by Venus. All six merchants had Chinese

addresses.  (Doc. 2-16 at 6-7).

On June 2, 2016, Charfoos with Venus responded as follows:

> First, as of today two of the six links that [ContextLogic] represent[s] would be taken down are still up and operating.  I have included screenshots of the images in the attached documents, but two links are:
>
> [web links omitted]
>
> Second, as you can see from the attached document, it appears that Wish.com has moved several of Venus's images from the web pages I identified and now is posting them on its sign in page.  Finally, we have received reports that Wish.com is also using Venus's images on Facebook to not only sell merchandise on Wish.com but also to drive customers to the iTunes store to download the Wish.com app.
>
> Although your email . . . suggests that the infringing Images were posted on Wish.com by third parties, using Venus's images on sign in pages and on Wish.com's Facebook account clearly suggests that Wish.com is also knowingly posting Venus's images along with its suppliers.

(Doc. 2-16 at 3-4).  Charfoos demanded that ContextLogic "do more" and respond to

Venus's demands.  Id. at 4.

ContextLogic's Brydum responded to Charfoos by email on June 3, 2016.  (Doc. 2-

16 at 2).  Brydum asked Charfoos to confirm that the items referenced were indeed taken

off of the Wish.com site.  Id.  She stated:

> Regarding your images showing the Wish Sign In page - we acknowledge your pictures are showing on your sign in page. Please understand that the sign in page is customized to each user's search results.  So, of course acknowledging that you have been searching for items with your pictures, it is only due to the algorithm of our company that your sign in page is showing those pictures consistently.
>
> Please note that as we continue to do our sweep and improving [sic] our brand protection system, those items will

be taken down/removed from your customized experience . . .

(Doc. 2-16 at 2).  Brydum encouraged Venus to review the Wish "brand protection

program" to "help us remove the items quickly."  Id.  Brydum said that to remove sites

"immediately," the copyright owner must "provide . . . the complete URL address of the

item.  A screenshot does not allow [ContextLogic] to access the item to remove it from

public access."  Id. at 2-3 (attaching a sample screenshot and directing that the owner

"copy & paste this URL address into the body of your email response for immediate

action to be taken.").  Brydum said that ContextLogic "will continue our sweeps to ensure

the items are taken down [sic] the third parties that have uploaded them."  Id. at 3.

> From here, [Venus] will be able to submit the items that
> infringe upon your pictures through our system that you find
> on our site.  We can review and remove the items through this
> [brand partner protection]  program for you as soon as the
> submissions occur.

Id. at 2.

On June 8, 2016, the Venus staff collected comments posted on the Venus

Facebook page, found on the Internet at http://www.facebook.com/VENUS. The persons

who purported to post the comments reflect that they thought they were purchasing

Venus products at bargain prices from on-line service providers, including the Wish

Website, only to discover that the products delivered were "knockoffs."  Sheffler Decl. ¶

13; (see also Doc.  2-11).  Venus staff "reviewed the Wish Website from July 6-8, 2016,

and identified approximately 100 photographs that appeared to be identical, substantially

identical or derivatives of the Venus copyrighted Images . . . ."  Sheffler Decl. ¶¶ 11, 12.

A copy of the captured photographs compared to Venus's copyrighted Images appears in

14

the record. (Doc. 2-10).  Venus did not provide any of these screenshots from July 6-8, 2016 to ContextLogic before filing the Complaint, or identify these images previously. Brydum Decl. ¶¶ 40, 42.  ContextLogic notes that some of the Images have been altered, by reversing or cropping.  "ContextLogic has taken down 60 posts it identified based on [Venus's identified] images, and additional posts that it identified as containing the same images" using its newly developed "fingerprint" technology.  Brydum Decl. ¶¶ 40, 41.

Venus found additional Images on the Wish Website in August, 2016, including an August 1, 2016 post on Facebook, and an August 4, 2016 post on the Wish Website. (Doc 33-1; Charfoos Decl. 2 ¶¶ 3, 4).  On August 4 and 8, 2016, Charfoos accessed four listed "links to Infringing Images through the Website."  Id. ¶ 6.

Venus has not become a member of ContextLogic's Brand Partner Program. Brydum Decl. ¶ 32.  ContextLogic asserts that it has not copied Venus's Images nor participated in any way with third-part Merchants posting allegedly infringing Images. Brydum Decl. ¶ 33.[3]

### C.    ContextLogic's New Software

ContextLogic has developed software "that enables it to identify images uploaded by third-party Merchants that are the same as images contained in posts that have been

---

[3] Brydum asserts:

> ContextLogic has not copied any of Venus's images.  Nor has ContextLogic altered, modified, or removed any copyright registration information, or other information, related to any images or content supplied by Merchants in conjunction with the third-party Merchant's offerings that incorporated the allegedly infringing images.  In fact, none of the images and other content provided to ContextLogic by the Merchants contained any visible patent, copyright, or trademark registration information.

Brydum Decl. ¶ 33.

taken down because of allegations that those posts violate third parties' intellectual

property rights." Kuntz Decl. ¶ 12.

> 34.    ContextLogic has been developing software that allows
> ContextLogic to fingerprint images contained in posts that
> have been taken down due to possible infringement of third-
> party intellectual property rights. This software allows
> ContextLogic to identify existing and future posts using the
> same image as the post that had been taken down so that
> ContextLogic may review the new post and determine whether
> it, too, should be taken down.
>
> 35.    . . . [T]his software was under development [in June
> 2016]. Although it is undergoing continued revisions,
> ContextLogic has begun using this software.
>
> 36.    Since at least as early as June 1, ContextLogic has
> used this software to screen new posts for possible use in
> those new posts of 34 images that Venus has identified to be
> allegedly infringing.
>
> 37.    17,035 posts have been identified using this
> technology. After review, ContextLogic has taken down those
> posts. The Merchants making the posts have been notified
> that the posts were taken down because of intellectual
> property concerns, and ContextLogic's merchant support
> group has been notified of the take-downs.
>
> 38.    ContextLogic will continue to use this software in an
> effort to identify additional posts using the images Venus has
> identified until further notice.

Brydum Decl. ¶¶ 34-38; see also Kuntz Decl. ¶¶ 12, 13, 14. The new software "is

presently identifying 6,000 product posts per week that may promote products or

incorporate intellectual property that has been the subject of a previous take-down

request." Kuntz Decl. ¶ 15. The new software "will not identify a second image as being

the same as an image contained in a post that was taken down if that second image has

been altered by, for example, adding elements to the image, using digital modification

technology to alter the image, changing the color of products depicted in the image or
cropping the image and using only a portion of the image." Id. ¶ 17.  ContextLogic
contends that "it lacks the ability to analyze each of the millions of images it receives from
third-party Merchants, compare submitted images to all other copyrighted images that
exist in the world, and determine whether each submitted image infringes someone's
copyright interest."  Brydum Decl. ¶ 44.

> ### D.   The Record of Notification and Removal

In response to the Court's request for supplemental information, ContextLogic
reports, with citation to the record, that Venus notified it by email communication "with
information required by the DMCA," of 41 allegedly infringing Images on March 21, 2016,
and that the Images were removed on March 21, 2016.  (Doc. 44-1 at 2-8) (Images 1-
41)).  ContextLogic received notification by "Email communication from Venus['s]
counsel" on June 1, 2016, of another 98 allegedly Infringing Images, and reports that
these Images were removed from the Wish Website on June 3, 2016.  (Doc. 44-1 at 8-32
(Images 42-140)).[4]

ContextLogic reports that on July 14, 2016, Venus notified ContextLogic of the
existence of 426 allegedly Infringing Images, set forth in the 27-page Exhibit B attached
to Venus' Motion for Preliminary Injunction, filed with the Court.  (See Doc. 2-10); (Doc.
44-1 at 40-137 (Images 173-599)).  According to ContextLogic, of this total, 320 were new
Images never before reported; 101 Images were included in the June 1, 2016 email
communication from Venus's counsel; and 26 Images were included in the March 21,

---

[4] ContextLogic objects to 31 Images, citing to Document 2-16, contending that the Images are
not in record."  (Doc. 44-1 at 32-40) (Images 141-172) .

2016 notification, though some of those Images are questionable because the original Images were not clear, and five of which did not also appear in the June 1, 2016 communication. Id.[5] ContextLogic reports that these Images were removed from the Wish Website "[n]o later than August 2, 2016." Id.

ContextLogic contends that another 23 Images were reported in Venus's Reply Brief, filed on August 10, 2016 (Doc. 32). (Doc. 44-1 at 137-142) (Images 600-623)). ContextLogic reports that these Images are "[n]ot in record (first identified in Plaintiff's Reply Brief)" and for 18 of the Images, cites to "Images Shown Previously," that were included in the June 1, 2016 email communication from Venus's counsel, and the July 24, 2016 Exhibit B court filing. Five of the Images have no previous citations.

Many of the Images are varied views or configurations (either through color changes or cropping of the Image or transposition to display a mirror image) of a previously identified Image. Thus, according to ContextLogic, "[w]hile Exhibit A [to its supplementary memorandum (Doc. 44-1)] includes approximately 611 Images, these Images appeared in a total of 91 Wish Posts and seven promotional pieces." (Doc. 44 at 2 (citing to Venus' communications from March through August, 2016)). ContextLogic further contends that "[o]nly 31 Wish Posts and two promotional pieces include an Image Venus previously identified to ContextLogic, regardless of whether the second Wish Post

---

[5]  Accounting for the fact that the Images are repetitive, and represent varied configurations of the same actual photograph, ContextLogic contends that in Exhibit B to the Motion for Preliminary Injunction (Doc. 2-10), "Venus identified a total of 64 Wish Posts that it was able to identify in July 2016 that contained Images that allegedly infringed on the copyrights of Venus." (Doc. 44 at 4 (citing Doc. 2-10 at 2-27)). "Of those 64 Wish Posts, only 22 of the posts contained images that Venus had previously identified to ContextLogic as copyrighted by Venus. . . The other 42 posts, and the Images contained in those posts, had never been identified to ContextLogic previously. ContextLogic first became aware of them when it received the motion for preliminary injunction, not through a take-down request from Venus." (Doc. 44 at 4).

has the same configuration of Images as the first Wish Post or includes all of the images depicted in the first post." (Doc. 44 at 2-3).

In response to the Court's request for supplemental briefing requiring specific citation to the record, Venus cites to the attached Exhibit A which it says "details each of the over 100 images identified in Venus's March 2016 and June 2016 notices to ContextLogic." (Doc. 45 at 3 (citing Doc. 45-1)). That exhibit displays images of various different garments, in different configurations. According to Venus, it notified ContextLogic of 41 different Images on March 21, 2016; 24 of those Images were found on the Wish Website on June 1, 2016; 15 Images appeared (multiple times) on July 14, 2016; and that there was no evidence in the record that any of the Images had been removed from the Wish Website. (Doc. 45-1 at 1-9).[6] It contends that on June 1, 2016, it notified ContextLogic of 130 different Images of garments in various configurations as to pose, color and views; that 81 of the Images appeared in the Website on July 14, 2016; that 36 Images were found on the Website on August 10, 2016; and that there is no "specific evidence" in the record that any Image was removed from the Website or explaining the method of removal. (Doc. 45-1 at 10-40).

After the lawsuit was filed, and in conjunction with its Motion for Preliminary Injunction, filed on July 14, 2016, Venus says that it provided notice to ContextLogic of 426 different Images, showing the same garments in various configurations. (Doc. 45-1 at 40-124). Of that total, Venus contends that 37 of those Images were found on the Wish Website on August 10, 2016. Again, Venus contends that there is "no specific

---

[6] Three of the Images listed by Venus were illegible.

evidence" of the date that any of the Images were removed, and no evidence of the method of removal. Id. Venus also lists 23 different Images of four garments in various configurations, of which it provided notice to ContextLogic on August 10, 2016, in its Reply filed in this lawsuit (Doc. 32). (Doc. 45-1 at 124-28).

In its September 30, 2016 Surreply, Venus asserts that "Venus employees continue to receive promotional advertisements and emails from ContextLogic and its partners containing Images that ContextLogic knows are infringing." (Doc. 53 at 1). See Doc. 53-1 (Brewster Decl. ¶¶ 2, 3 and Exs. A and B). Specifically, Venus cites to a September 13, 2016 Facebook.com newsfeed posting of an allegedly infringing Image that had been noticed by email on June 1, 2016, and July 14, 2016 as part of its Motion for Preliminary Injunction. When the September 13, 2016 link was clicked on, the post had been removed from the Wish website. (Doc. 53-4 (Sheffler Decl. (2) ¶¶ 2, 3); (Doc. 53-5). A September 21 2016 promotional email displaying the same allegedly infringing Images directed the user to the Wish Website as opposed to a specific post, and to a September 21, 2016 promotional email. Id.

ContextLogic responds that "[t]he two promotional pieces identified by Venus result from posts uploaded by third-party merchants to the ContextLogic computer system, [and that] [n]either of these posts had been identified to ContextLogic by Venus previously." (Doc. 54 at 1 (citing Doc. 54-1 (Brydum Decl. 2 at ¶¶ 5, 10))). ContextLogic asserts that "[t]his is not a merchant post that Venus identified to ContextLogic previously," and that Venus's prior identifications of Images of the garment displayed "have not been in the configuration of images contained in the Merchant Post." (Doc. 54-1; Brydum Decl. 2 ¶¶

5, 10)).[7]  ContextLogic states that Venus provided no "take-down" notice with regard to these later Images.  (Doc. 54-1 (Brydum Decl. 2 ¶¶ 4, 9)).  Brydum notes that the Merchant Posts generating the Facebook newsfeed Image had been taken down by ContextLogic on August 30, 2016 without prompting from Venus; that ContextLogic notified Facebook to stop posting the Images; that the Merchant Post generating the email was taken down July 29, 2016; and that no sales of merchandise offered through the Merchant Posts could be made through the ContextLogic site.  (Doc. 54-1 (Brydum Decl. 2 ¶¶ 6, 11)); (Doc. 54-2 (Xie Decl. 2 ¶¶ 5, 6, 7, 8)).  ContextLogic asserts that its "programming used in selecting images for generalized promotional pieces such as this has [since] been modified to prevent the appearance of images from posts that have been taken down."  (Doc. 54 at 2); (Doc. 54-2; (Xie Decl. 2 ¶ 12)); (see also Doc. 40; Transcript at 69 (Third party advertising is "being pulled back.  Third party merchants are being told not to continue to promote that Image" once an infringement is identified.)).

      With regard to the 17,000 Images removed by ContextLogic, the Noticed Images that did not include a URL address were removed by ContextLogic through use of its technology and manually by approximately nine content managers "just clicking through bathing suit images to try to find what has been identified," using keywords to search and "narrow the universe."  Transcript at 45-46.  Because the electronic search for Images "may have some limitations in terms of permutations," the "content managers are then

---

[7]  The Image displayed on the September 13, 2013 Facebook newsfeed (Doc. 53-2 at 2) differs from the June 1, 2016 Venus email (Doc. 2-15 at 6) and the July 14, 2016 filing (Doc. 2-10 at 9), to the extent that the later Image crops the model's head, and the later Image shows a black shirt similar to the June 1 Image, while the July 14 Images displays a burgundy shirt.  The September 21, 2016 promotional email shows three iterations of the same Image in burgundy, blue and black, with the model flipped and facing right in two of the configurations and left in the other, (Doc. 53-5 at 3), while the June 1, 2016 and July 14, 2016 Images face left.

virtually following up and going beyond that and taking down Images that might not be

caught by the screening itself." Id. at 57. The fingerprinting system "captures the vast

majority of any potential issues." Id. at 58; see also id. at 60 (counsel for ContextLogic

representing that Context Logic is "monitoring its system on an ongoing basis for posts

that include variations of those [Noticed] Images. And that includes reverse Images, . . .

some of this can be captured, potentially captured, by the software that's developed.

Some of it's being captured by the human beings who are now at the point of having

named many of these models.").

###    E.    The Complaint and Defenses

On July 14, 2016, Venus filed a three-count Complaint naming ContextLogic Inc.

as Defendant, and alleging:

>    Direct Copyright Infringement (Count I)
>
>    Contributory Copyright Infringement (Count II)
>
>    Vicarious Copyright Infringement   (Count III)

(Doc. 1; Complaint).[8] ContextLogic answered the Complaint, denying the substantive

allegations, and asserting a Counterclaim for declaratory judgment of noninfringement.

(Doc. 27). Among the affirmative defenses asserted by ContextLogic is the defense that

ContextLogic is not liable to Venus under The Digital Millennium Copyright Act ("DMCA"),

17 U.S.C. § 512. Id. at 9.

---

[8]   Venus also named Wish, Inc. as a Defendant. On September 1, 2016, Venus filed a Notice
of Dismissal without prejudice of Wish, Inc., based upon Wish, Inc.'s counsel's representation that Wish,
Inc. is not affiliated with the website www.wish.com or with any of the businesses that appear on the
website www.wish.com.   (Doc. 43). The Court dismissed Venus's claims against Wish, Inc. without
prejudice on September 13, 2016.  (Doc. 48).

## III.    Applicable Law

### A.    Infringement

Section 502(a) of the Copyright Act authorizes a court to grant injunctive relief "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a).

#### 1.    Direct Infringement

"In an action for direct infringement, the owner of a copyright may bring a claim against anyone who violates one of the 'exclusive rights' protected by the Copyright Act." Cambridge Univ. Press v. Patton, 769 F.3d 1232, 1241 n.5 (11th Cir. 2014) (citing 15 U.S.C. § 501(a)); see also BUC Int'l Corp. v. Int'l Yacht Council Ltd., 489 F.3d 1129, 1138 n.19 (11th Cir. 2007).  To make out a prima facie case of direct copyright infringement, a plaintiff must show that (1) it owns a valid copyright, and that (2) defendant copied protected elements of the copyrighted material.  See Peter Letterese And Assocs., Inc. v. World Inst. Of Scientology Enters., Int'l, 533 F.3d 1287, 1300 (11th Cir. 2008).  The copyright holder is protected from the reproduction of copyrighted works or preparation of derivative works.  Cambridge Univ Press. 769 F.3d at 1341 n.5 (citing 15 U.S.C. § 106).

#### 2.    Contributory Infringement

"Although the Copyright Act does not expressly provide for any liability for infringement committed by another, 'the[ ] doctrines of secondary liability emerged from common law principles and are well established in the law.'"  Cambridge Univ. Press, 769 F.3d at 1241 n.6 (citation omitted); see also BUC Int'l Corp., 489 F.3d at 1138 n.19.  For ContextLogic to be secondarily liable, Venus must establish that there has been direct infringement by a third party.  See Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146,

1169 (9th Cir. 2007); see also Peter Letterese And Assocs., 533 F.3d at 1299 n.11

("'[T]here can be no contributory infringement without a direct infringement.'" (citation

omitted)).

   "A claim of contributory copyright infringement arises against one who intentionally

induces or encourages the direct infringement of another." Cambridge Univ. Press, 769

F.3d at 1242 n.6 (citing Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S.

913, 930 (2005)). "Contributory copyright infringement refers to the intentional

inducement, causation or material contribution to another's infringing conduct." BUC Int'l

Corp., 489 F.3d at 1138 n.19. A "contributory infringement claim requires, at a minimum,

both an allegation of a direct infringement by a third party, and an allegation of an

intentional or knowing contribution to that infringement by the defendant" Optimum

Techs., Inc. v. Henkel Consumer Adhesives, Inc., 496 F.3d 1231, 1245 (11th Cir. 2007).

   Applying copyright concepts to "cyberspace," "'if a computer system operator

learns of specific infringing material available on his system and fails to purge such

material from the system, the operator knows of and contributes to direct infringement,'"

and may be contributorily infringing. Perfect 10, 508 F.3d at 1171 (quoting A&M Records,

Inc. v. Napster, Inc., 239 F.3d 1004, 1021 (9th Cir. 2001)).   But "absent any specific

information which identifies infringing activity, a computer system operator cannot be

liable for contributory infringement merely because the structure of the system allows for

the exchange of copyrighted material." Napster, 239 F.3d at 1021.  A computer system

operator can be held contributorily liable if it has actual knowledge that specific infringing

material is on its system, and can take simple measures to prevent further damage to

copyrighted works, yet continues to provide access to infringing works.  Perfect 10, Inc.,

508 F.3d at 1172.

### 3.   Vicarious Infringement

"Liability for vicarious copyright infringement arises 'when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement.'" BUC Int'l Corp., 489 F.3d at 1138 n.19 (quoting Grokster, 545 U.S. at 931 n.9). "A claim of vicarious copyright infringement arises against one who 'profit[s] from [another's] direct infringement while declining to exercise a right to stop or limit it.'" Cambridge Univ. Press, 769 F.3d at 1242 at n.7 (citation omitted). "[A] plaintiff must establish that the defendant exercises the requisite control over the direct infringer and that the defendant derives a direct financial benefit from the direct infringement." Perfect 10, 508 F.3d at 1173. "[A] defendant exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." Id. This includes a service provider with a "closed system requiring user registration," that could terminate its users' accounts and block their access to the servicer's system constituting a "right and ability to prevent its users from engaging in the infringing activity." Id. at 1174 (citing Napster, 239 F.3d at 1023-24). As to the second inquiry, the plaintiff must establish that the service provider has the "practical ability to police the infringing activities of [third parties]" as opposed to suggesting measures that are imprecise, overbroad or not workable. See id. at 1174. "Although 'the lines between direct infringement, contributory infringement, and vicarious liability are not clearly drawn,'" in general, contributory liability is based on the defendant's failure to stop its own actions which facilitate third-party infringement, while vicarious liability is based on the defendant's failure to cause a third

25

party to stop its directly infringing activities. Id. at 1175 (quoting Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 435 n.17 (1984)).

In order to prevail at the preliminary injunction stage, Venus must demonstrate a likelihood of success in establishing at least one of these three claims.

**B.     The Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512**

Congress enacted Title II in of the DMCA in 1998 "'to provide greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities.'" Perfect 10, Inc., 508 F.3d at 1158 (quoting Ellison v. Robertson, 357 F.3d 1072, 1076 (9th Cir.2004)); see also Disney Enters., Inc. v. Hotfile Corp., No. 11-20427-CIV, 2013 WL 6336286, at *18 (S.D. Fla. Sept. 20, 2013).   "[T]he DMCA imposes certain requirements on service providers in exchange for limitations on liability." EMI Christian Music Grp., Inc. v. MP3tunes, LLC,, 844 F.3d 79, 89 (2d Cir. 2016) (emphasis omitted).  In passing the DMCA, "Congress recognized that '[i]n the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability.'" UMG Recordings, Inc. v. Shelter Capital Partners LLC, 718 F.3d 1006, 1014 (9th Cir. 2013) (quoting S. Rep. No. 105–190, at 8 (1998)) see also e.g. Capitol Records, LLC v. Vimeo, LLC, 826 F.3d 78, 82 (2d Cir. 2016) (Congress passed the DMCA "to 'clarif[y] the liability faced by service providers who transmit potentially infringing material over their networks,' and in the process to 'ensure[ ] that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will expand.'" (quoting S. Rep. No. 105-190, at 2 (1998)), petition for cert. docketed, No. 16-771 (U.S. Dec. 16, 2016).  The DMCA represents "Congress's foray into mediating the competing interests in protecting

26

intellectual property interests and in encouraging creative development of devices for using the Internet to make information available." Columbia Pictures Indus., Inc. v. Fung, 710 F.3d 1020, 1024 (9th Cir. 2013).

> Although Congress was aware that the services provided by companies [service providers] are capable of being misused to facilitate copyright infringement, it was loath to permit the specter of liability to chill innovation that could also serve substantial socially beneficial functions.  Congress decided that "by limiting [service providers'] liability," it would "ensure [ ] that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand." . . .  To that end, [the DMCA] created four safe harbors that preclude imposing monetary liability on service providers for copyright infringement that occurs as a result of specified activities.

UMG Recordings, 718 F.3d at 1014 (quoting S.Rep. No. 105-190, at 8 (1998)).  The DMCA represents "a compromise, which, on the one hand, augments the protections available to copyright owners, and, on the other, insulates service providers from liability for infringements of which they are unaware, contained in material posted to their sites by users, so as to make it commercially feasible for them to provide valuable Internet services to the public." Capitol Records, LLC, 826 F.3d at 82. "The DMCA [adds] a second step to assessing infringement liability for Internet service providers, after it is determined whether they are infringers in the first place under the preexisting Copyright Act." CoStar Grp., Inc. v. LoopNet, Inc., 373 F.3d 544, 555 (4th Cir. 2004). A service provider that qualifies for protection under the DMCA is not liable for monetary relief and may be subject only to the narrow injunctive relief set forth in 17 U.S.C. § 512(j). Perfect 10, Inc., 508 F.3d at 1158 (citing 17 U.S.C. § 512(a)). If Venus demonstrates a likelihood of success on any of its claims, then ContextLogic must show a likelihood of succeeding

27

in its defense that it qualifies for protection under the DMCA.  See id.

Specifically, ContextLogic asserts an affirmative defense pursuant to 17 U.S.C. § 512(c), and also cites to 17 U.S.C. 512(m).  (See e.g. Doc. 25 at 12, 16); (Doc. 37-1 at 23, 29).

Section 512(c)'s liability-limiting provision

> gives Internet service providers a safe harbor from liability for "infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider" as long as the service provider can show that: (1) it has neither actual knowledge that its system contains infringing materials nor an awareness of facts or circumstances from which infringement is apparent, or it has expeditiously removed or disabled access to infringing material upon obtaining actual knowledge of infringement; (2) it receives no financial benefit directly attributable to infringing activity; and (3) it responded expeditiously to remove or disable access to material claimed to be infringing after receiving from the copyright holder a notification conforming with requirements of § 512(c)(3). Id. § 512(c)(1). [Footnote omitted.] Thus, to qualify for this safe harbor protection, the Internet service provider must demonstrate that it has met all three of the safe harbor requirements, and a showing under the first prong—the lack of actual or constructive knowledge—is prior to and separate from the showings that must be made under the second and third prongs.

ALS Scan, Inc. v. RemarQ Communities, Inc., 239 F.3d 619, 623 (4th Cir. 2001).

On the other hand,

> [t]he Act augments the rights of copyright owners by establishing a notice-and-takedown regime.  The notice-and-takedown regime requires a service provider, to preserve its eligibility for the safe harbor, to "expeditiously ... remove ... material that is claimed to be infringing," or disable access to it, whenever the service provider (1) receives a notice of infringing material on the service provider's site or (2) otherwise becomes aware of the infringement or of circumstances making the infringement apparent. §

28

> 512(c)(1)(C), (A)(iii). [Footnote omitted.]  The provisions favoring Internet service providers, first, immunize those that qualify for the statute's benefits [footnote omitted] from liability for copyright infringements posted by users on the providers' websites if the service providers are unaware of the infringements, and, second, expressly relieve them of any obligation to monitor the postings of users to detect infringements as a condition of qualifying for the safe harbor. Service providers, however, forfeit entitlement to the safe harbor if they fail to expeditiously remove the infringing material upon receipt of notification of the infringement or upon otherwise becoming aware of it. [Footnote omitted.].

Capitol Records, LLC, 826 F.3d at 83.

Congress enacted the DMCA "to foster cooperation among copyright holders and service providers in dealing with infringement on the Internet." UMG Recordings, 718 F.3d at 1021.  Because "[c]opyright holders know precisely what materials they own, and are thus better able to efficiently identify infringing copies than service providers . . . who cannot readily ascertain what material is copyrighted, and what is not," UMG Recordings, 718 F.3d at 1022 (citing S.Rep. No. 105-190 at 48).  Congress enacted the "notice and takedown protocol encouraging copyright holders to identify specific infringing material to service providers," and prohibited consideration of deficient notices for purposes of determining actual knowledge. Id.  The "DMCA notification procedures . . . place the burden of policing copyright infringement - identifying potentially infringing material and adequately documenting infringement - squarely on the owners of the copyright." Id. (quoting Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1113 (9th Cir. 2007)).  "[T]he DMCA recognizes that service providers who do not locate and remove infringing materials they do not specifically know of should not suffer the loss of safe harbor protection." Id. at 1023; see also 17 U.S.C. § 512(m) (stating that the DMCA does not

29

impose a duty on the service provider to investigate or monitor its site).

ContextLogic cites to the safe harbor defense found in Section 512(c), which limits liability for copyright infringement for "information residing on systems or networks at the direction of users." Perfect 10, Inc., 508 F.3d at 1158. "A service provider that qualifies for such protection is not liable for monetary relief and may be subject only to the narrow injunctive relief set forth in section 512(j). Id. (citing 17 U.S.C. § 512(a).

If Venus demonstrates the likelihood of success on its contributory or vicarious claims, then ContextLogic "must show a likelihood of succeeding in its claim that it qualifies for protection under . . . the DMCA." Perfect 10, Inc., 508 F.3d at 1158; see also id. at 1175 (noting that "the limitations on liability contained in 17 U.S.C. § 512 protect secondary infringers as well as direct infringers.").

### 1. Safe Harbor Eligibility Requirements: 17 U.S.C. § 512(c)(1):

In order to eligible for the DMCA § 512(c) "safe harbor" defense, Defendant ContextLogic must demonstrate the following:

(1) **Does not have actual knowledge** - "that the material or an activity using material on the system is or network infringing." 17 U.S.C. § 512(c)(1)(A)(i);

(2) **Does not have apparent knowledge** - "is not aware of facts or circumstances from which infringing activity is apparent." 17 U.S.C. § 512(c)(1)(A)(ii) ("red flag knowledge");[9]

---

[9]       The difference between actual and red flag knowledge is ... between a subjective and an objective standard. In other words, the actual knowledge provision turns on whether the provider actually or "subjectively" knew of specific infringement, while the red flag provision turns on whether the provider was subjectively aware of facts that would have made the specific infringement "objectively" obvious to a reasonable person. The red flag provision, because it incorporates an objective standard, is not swallowed

(continued...)

(3)     "[U]pon obtaining knowledge or awareness, **acts expeditiously** to remove or disable access to" the infringing material.  17 U.S.C. § 512(c)(1)(A)(iii);

(4)     Does not have "the **right and ability to control" the third party activity**.  17 U.S.C. § 512(c)(1)(B);[10]

(5)     (Where the service provider has the right and ability to control third party activity), "**does not receive financial benefit** directly attributable to the infringing activity."  17 U.S.C. § 512(c)(1)(B);

(6)     "**[U]pon notification** of claimed infringement, . . .  **responds expeditiously** to remove, or disable access" to the allegedly infringing material.  17 U.S.C. § 512(c)(1)(C).[11]

(7)     Has a "adopted and reasonably implemented" **repeat infringer policy**.  17 U.S.C. § 512(i)(1)(A).

## 2.     Notification Requirements   17 U.S.C. § 512(c)(3)(A)

"The DMCA's detailed notice and takedown procedure assumes that, 'from time to time,' 'material belonging to someone else ends up' on service providers' websites, and establishes a process for ensuring the prompt removal of such unauthorized material."

---

[9](...continued)
up by the actual knowledge provision under our construction of the § 512(c) safe harbor.  Both provisions do independent work, and both apply only to specific instances of infringement.

UMG Recordings, Inc., 718 F.3d at 1025-26 (quoting Viacom Int'l v. YouTube, Inc., 676 F.3d 19, 31 (2d Cir.2012), and citing S.Rep. No. 105–190, at 44).

Notably, the Notice requirements of 17 U.S.C. § 512(c)(3)(A) do not apply and are not required to be met in order to establish "actual" or "apparent" "red flag" knowledge under § 512(c)(1)(A).  17 U.S.C. § 512(c)(3)(B)(1).

[10]   The Ninth Circuit has held that a service provider's right to remove materials posted by third parties does not satisfy the "right and ability to control" prong, because such power is necessary for the service provider to satisfy the basic requirement of "takedown" under the DMCA.  UMG Recordings, 718 F.3d at 1027, 1030.

[11]   A service provider has no duty to "monitor[ ]" its service or to "affirmatively seek[ ] facts indicating infringing activity, except to the extent consistent with a standard technical measure," to be eligible for the "safe harbor" defense.  17 U.S.C. § 512(m)(1).

UMG Recordings,, 718 F.3d at 1024 (emphasis omitted).  An informal e-mail is not
sufficient notice, though it may be sufficient "red flag" notice to establish apparent
knowledge under § 512(c)(1)(A)(ii).  Id. at 1025.  Rather, the written communication
provided to the designated agent of a service provider must include substantially the
following:

> (i)  A physical or electronic **signature** of a person authorized
> to act on behalf of the owner of an exclusive right that is
> allegedly infringed.
>
> (ii) **Identification** of the copyrighted work claimed to have
> been infringed, or, if multiple copyrighted works at a single
> online site are covered by a single notification, a
> representative list of such works at that site.
>
> (iii) **Identification** of the material that is claimed to be
> infringing or to be the subject of infringing activity and that is to
> be removed or access to which is to be disabled, and
> information **reasonably sufficient to permit the service
> provider to locate the material**.
>
> (iv) **Information "reasonably sufficient" to permit the
> service provider to contact the complaining party,** such as
> an address, telephone number, and, if available, an electronic
> mail address at which the complaining party may be contacted.
>
> (v) A statement that the complaining party has a good faith
> belief that use of the material in the manner complained of is
> not authorized by the copyright owner, its agent, or the law.
>
> (vi) A statement that the information in the notification is
> accurate, and under penalty of perjury, that the complaining
> party is authorized to act on behalf of the owner of an
> exclusive right that is allegedly infringed.
>
> (B)(i) Subject to clause (ii), **a notification** from a copyright
> owner or from a person authorized to act on behalf of the
> copyright owner **that fails to comply substantially** with the
> provisions of subparagraph (A) **shall not be considered**
> under paragraph (1)(A) in determining whether a service

provider has **actual knowledge or is aware** of facts or
circumstances from which infringing activity is **apparent**.

(ii) In a case in which the notification that is provided to the
service provider's designated agent fails to comply
substantially with all the provisions of subparagraph (A) but
substantially complies with clauses (ii), (iii), and (iv) of
subparagraph (A), clause (i) of this subparagraph applies only
if the service provider promptly attempts to contact the person
making the notification or takes other reasonable steps to
assist in the receipt of notification that substantially complies
with all the provisions of subparagraph (A).

17 U.S.C. § 512(c)(3)(A) (emphasis added).

The Second Circuit Court of Appeals has adopted a shifting burden of proof under

the DMCA, saying that

the service provider initially establishes entitlement to the safe
harbor by showing that it meets the statutory definition of an
eligible service provider (on whose website the allegedly
infringing material was placed by a user), and that it has taken
the general precautionary steps against infringement that are
specified in the statute. The service provider could
nonetheless be denied the safe harbor if the plaintiff-
rightsholder showed that the service provider had actual
knowledge, or red flag knowledge, of the infringement. The
burden of proof with respect to actual or red flag knowledge
would be on the plaintiff.

Capitol Records, LLC v. Vimeo, LLC, 826 F.3d at 94-95.

## IV.   **The Parties' Arguments**

### A.   **Plaintiff Venus's Arguments**

Venus contends that ContextLogic is "infringing on Venus's registered copyrights

by utilizing identical, substantially similar, or derivatives of photographs and images that

are used to promote, sell, offer for sale or distribute Defendants' products . . . through a

fully interactive commercial Internet website, www.wish.com, mobile applications and

33

other social media outlets." (Doc. 2 at 6).  Venus argues that it is being irreparably injured by ContextLogic's infringement which deprives Venus of its right to determine how its copyrighted works are presented; deceives the public regarding Venus's association with the goods marketed and sold on the Wish Website; creates marketplace and customer confusion; and wrongfully harms Venus's reputation and goodwill by diverting business from Venus and tarnishing Venus's brand. Id. at 6, 15, 21-23.  Venus asks the Court to enjoin ContextLogic "from further infringing, directly or indirectly, Venus's copyrighted works." Id. at 6.

Venus seeks an Order from the Court requiring ContextLogic to (1) respond to Venus's take-down notices by removing infringing Images within 48 hours of the notice; (2) terminate "recidivist Merchants from the Wish Website; (3) cease including infringing Images in emails to users and transmitting these Images to third party web operators; and (4) report to the Court at reasonable intervals how ContextLogic has complied with the Court's injunction.  (Doc. 40; Transcript at 5-8).[12]

Addressing the likelihood of success on the merits of its claims, Venus argues that ContextLogic directly infringes on its copyrighted material by posting identical or "substantially identical" copies of its Venus's copyrighted images on the Wish Website. (Doc. 2 at 17).  Venus also argues that "[e]ven if the Infringing Photographs were

---

[12]  Venus has apparently refined its requested relief during the interval of time between the July 14, 2016 filing of its Motion, and the August 17, 2016 hearing on the Motion.  In its Motion, Venus requests that the Court (1) require ContextLogic to "modify the Wish 'algorithm' to stop the redistribution and display of Venus's images and if Wish cannot modify the 'algorithm,' to disable the 'algorithm' until Wish can do so," and to enjoin ContextLogic from "(1) displaying any of Venus's images on [the] website, www.wish.com, from using Venus's images in its promotional emails, or on any other social media platform; (2) transferring the domain name wish.com during the pendency of this action; and (3) preventing the transfer of Defendants' assets." (Doc. 2 at 7, 24-27).  The Court will consider the relief requested by counsel for Venus at the hearing, which supercedes that sought by the Motion.

originally posted on Wish by third party merchants, [ContextLogic] is still liable for direct infringement because the 'algorithm,' designed and implemented by [ContextLogic], copies the Infringing Photographs and repeatedly displays them on Wish's sign in screen, in Wish's promotional emails, on Wish's mobile applications, and on Wish's other social media platforms." (Doc. 2 at 19); (see also Doc. 32 at 2, 7-8).

Venus argues that ContextLogic is liable for indirect infringement for images posted on the Wish Website. (Doc. 2 at 19). Venus argues that because ContextLogic has knowledge of the infringing acts, it is liable for inducing, causing, or materially contributing to the infringement by the third parties, from March 21, 2016, through the filing of this lawsuit. Specifically, Venus contends that ContextLogic is liable for contributory infringement because its failure to adequately enforce its copyright infringement policy coupled with the "proliferation of infringing material" on the Wish Website and in ContextLogic promotional materials "send[s] the message to Wish merchants that use of the Infringing Photographs is encouraged by [ContextLogic]." (Doc. 2 at 20); (see also Doc. 32 at 9). Venus argues that ContextLogic is liable for vicarious infringement  because it is profiting from the direct infringement through revenue sharing, while declining the opportunity to stop or limit the infringement, and failing to exercise its right to supervise or to control Merchants' access to the Wish Website. (Doc. 2 at 20); (Doc. 32 at 10). In summary, Venus argues that it is entitled to a preliminary injunction because:

> 1)      ContextLogic was able to identify more than 17,000 infringing posts using only the 34 Images provided by Venus "with tens of thousands more likely not yet searched for";
>
> 2)      ContextLogic directly infringes upon Venus's

> copyrighted Images "because it admits it has developed an
> algorithm and system that tracks a user's browsing history,
> copies the Infringing Images and then publishes them in
> promotional emails, splash screens and on third-party
> websites - without the involvement of the Merchants";
>
> 3)    ContextLogic was capable of identifying and taking down
> posts in March 2016 "using just a photograph provided by Venus
> which gave sufficient notice of all of the Infringing Images"; and
>
> 4)    ContextLogic has "failed to remove all of the Infringing
> Images" despite "months of notice."

(Doc. 32 at 2).  Venus contends that its notice to ContextLogic, providing 34 images of

alleged infringed images, was sufficient, inasmuch as ContextLogic was capable of

removing 17,035 images based upon "fingerprint images" even without Venus providing

the URL address.  "[T]his limited information was, in fact, sufficient notice to remove the

infringing posts."  (Doc. 32 at 3, 13).

   **B.    Defendant ContextLogic's Arguments**

   ContextLogic responds that in accordance with its policies, upon notification from

Venus in March and May 2016, it acted expeditiously to remove posts allegedly infringing

upon the intellectual property rights of Venus.  (Doc. 25 at 1-2).  Additionally, according to

ContextLogic,

> after receiving the notices from Venus, ContextLogic began
> using computer software that it has developed to monitor
> activity on the ContextLogic system in an effort to identify
> posts containing the same images that were the subject of
> previous Venus notices.  To date, ContextLogic has identified
> and taken down over 17,000 posts that appeared to use the
> same images in which Venus claims copyrights as posts
> previously taken down by ContextLogic.

(Doc. 25 at 2); see also id. at 5.  ContextLogic argues that Venus is not substantially likely

to succeed on its claim of direct infringement because "a defendant cannot be held liable

for direct copyright infringement based on copies of third-party submitted material that are automatically generated by a system that operates without human intervention beyond the initial set up and continual maintenance of that system." Id. at 7 (citing, Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc., 907 F. Supp. 1361, 1368 (N.D. Cal. 1995); ALS Scan, Inc., 239 F.3d at 622. Likewise, ContextLogic contends that Venus cannot prevail on its claim of contributory copyright infringement because Venus cannot establish that 1) ContextLogic had actual knowledge of specific infringing material and 2) ContextLogic can take simple steps to prevent further damage, yet continued to provide access to infringing works. Id. at 10. Finally, ContextLogic argues that Venus cannot establish a likelihood of success on the merits of its vicarious liability claim because in the context of an online marketplace, the "right and ability to supervise the infringing conduct" required for vicarious liability for the infringement by others, "requires more than the mere ability to take down a particular post made by a third-party merchant." Rather, "the ability to control extends to the ability of the service provider to alter the third-party merchant's conduct." Id. at 11 (citing Hendrickson v. eBay, Inc., 165 F. Supp. 2d 1082, 1093 (C.D. Cal. 2001)).

Moreover, in addition to not being liable under Venus's theories of recovery, ContextLogic argues that it is immune from liability for copyright infringement under the DMCA because 1) it is a service provider that has 2) adopted a policy and procedure for termination of users of its system that are repeat infringers, and had no actual or apparent knowledge of alleged copyright infringement upon which it did not act. (Doc. 25 at 11-15). ContextLogic argues that on two occasions, Venus provided reasonably sufficient notification of potentially infringing postings on the Wish Website that allowed

37

ContextLogic to locate and identify the infringing posts, and that in both instances, ContextLogic acted expeditiously to remove the posts from the Wish Website as well as from advertisement and promotional material.  Additionally, ContextLogic has put in place software to remove other posts that appear to incorporate the same Venus Images that were the subject of Venus's notifications.  Id. at 21.  However, according to ContextLogic, Venus's "broad demand that ContextLogic take down images based on screenshots that do not contain reasonably sufficient information to identify third-party Merchant posts" do not serve as sufficient notice to disqualify ContextLogic from DMCA safe harbor protection.  Id. at 17-18 (citing Perfect 10, Inc. v. Giganews, Inc., No. CV 11-07098-AB (SHx), 2014 WL 8628031, at *8-10 (C.D. Cal. Nov. 14, 2014)).

ContextLogic argues that there is no evidence that a "Wish Post containing an allegedly infringing Image remained accessible after ContextLogic was made aware of the post," and that "there is no evidence that later-identified posts containing the same image existed on ContextLogic's computer system at the time Venus provided notice of the initial post allegedly infringing Venus's copyrights."  (Doc. 44 at 3).  It contends that though it has continued to screen for new posts that possibly infringe, it is not required to do so under the DMCA.  Id. at 3-4 (citing Hendrickson v. Amazon.Com, Inc., 298 F. Supp. 2d 914, 917 (C.D. Cal. 2003); 17 U.S.C. § 512(m)).  However, ContextLogic acknowledges that its "fingerprint" technology can be applied to new postings.  Id. at 5-6 (citing Brydum Decl. ¶ 34-38).  As a result, it has used this computer technology, as well as manual efforts to identify potentially infringing posts, resulting in the takedown of "additional posts it identified as containing the same images" as those identified to ContextLogic by Venus.  (Doc. 44 at 6 (citing Doc. 55-1, Brydum Decl. ¶¶ 27, 41)).

ContextLogic asserts that it "will use its software 'in an effort to identify additional posts using the images Venus has identified,' without limitation to the number of images, the format in which those images may appear in a particular post, or when those images are first identified to ContextLogic as appearing in Wish Posts or promotional materials." (Doc. 44 at 8 (citing (Doc. 25-1; Brydum Decl. ¶ 38 (stating that ContextLogic will continue to use its "fingerprint" "software in an effort to identify additional posts using the images Venus has identified.")).[13]  It argues that there is no evidence in the record that any third-party Merchant is a recidivist, re-posting copyrighted images after it has been subjected to a "take-down."  (Doc. 44 at 6).

It is ContextLogic's position that its "present screening efforts, supplemented by the reasonable assistance of Venus in notifying ContextLogic of new posts and images of concern, is more than sufficient to address the alleged irreparable harm that Venus claims."  (Doc. 44 at 9).  As such, ContextLogic contends that Venus's Motion should be denied because ContextLogic's actions conform to and entitle it to protection from the DMCA safe harbor provision, 17 U.S.C. § 512; because Venus has already received relief beyond that which the law would impose; and because any further relief would impose an undue hardship on ContextLogic.  (Doc. 25 at 2); see also id. at 6.

C.   **Venus's Reply**

Venus contends that the DMCA does not provide safe harbor protection to

---

[13]   ContextLogic argues that "Venus has identified a total of only 24 posts containing Images that Venus had previously identified as copyrighted but which were not identified and removed under ContextLogic's current screening processes."  (Doc. 44 at 5 (citing to (Doc. 2-10 (Exhibit B to Venus' Motion for Preliminary Induction, filed on July 24, 2016) and the (Doc. 33-1 at 7-8; Charfoos Declaration, dated August 10, 2016, filed with Venus's Reply)).  ContextLogic concedes that Venus would have a claim for damages regarding those 24 posts were it to be successful on its copyright claims.  Id.

ContextLogic for its "own acts of direct infringement by using Infringing Images in promotional emails, on splash screens or sending copies to third parties for advertisement on their websites." (Doc. 32 at 10 (citing 17 U.S.C. § 512)). Additionally, Venus argues that ContextLogic is not eligible for any safe harbor protection because it has failed to adopt a reasonable policy that provides for the termination of Merchants guilty of posting Infringing Images; it has failed to take sufficient action against repeat offenders; and it has not acted expeditiously, failing to take down images within hours of sufficient notice. Id. at 11-12, 14. Venus argues that the record contains no evidence of identified Images that ContextLogic has removed from the Wish Website, and that ContextLogic "admits that it did not take down all of the Images that Venus included in its notices." (Doc. 45 at 2). Rather, according to Venus, "the evidence in the record suggests that ContextLogic is only searching for exact copies of the [noticed] post as a whole." Id. at 3 (citing Doc. 25-1; Brydum Decl. ¶ 36 ("'Since at least as early as June 1, 2016, ContextLogic has used this software to screen new posts for possible use in those new posts of the 34 Images that Venus identified to be allegedly infringing.'")).

Venus contends that the record is void of evidence that ContextLogic "has taken any specific action to identify, let alone punish, any Merchant who repeatedly posted Infringing Images," or is "adequately policing its website." Id. at 4-5.

## V.   **Discussion**

The Court has attempted to fathom the parties' competing proffers of Venus's notice to ContextLogic of allegedly infringing Images, and ContextLogic's response. It has sifted through pages of fashion Images, and concedes that it may have miscounted the Images by category in trying to summarize the parties' supplemental filings. The

parties pass like ships in the night, failing to agree on exactly what was noticed and what was removed, making it impossible for the Court to precisely distill the parties' dispute. But from the morass, the Court does reach the following conclusions:

(1)    Venus has copyright registrations for 5,411 Images.  (See Doc. 37-1 at 3).

(2)    ContextLogic has approximately 110,000 Merchants posting approximately 71.8 million items for sale through the Wish App or the Wish Website, with  approximately 490,000 items added each day.  (Doc. 25-2; Chuang Decl. ¶¶ 15-17).

(3)    ContextLogic's Wish Website has in the past, and may in the future, display Images which allegedly infringe upon Venus's copyright.

(4)    All Merchants are subject to ContextLogic's Terms of Service, which include a prohibition of copyright infringement.  ContextLogic has a copyright infringement policy, called "Wish Copyright Dispute Policy."  (Doc. 25-1; Brydum Decl. ¶¶ 7, 8, 9, 10); see also (Doc. 25-1 at 11, 23).

(5)    ContextLogic maintains a nine person Content Management Team to respond to and analyze "take-down" requests and to monitor new posts.  ContextLogic also has software in place that takes the post at issue down almost immediately after a request from the Content Management Team.  (Doc. 25-2; Chuang Decl. ¶ 19); (Doc 25-4; Kuntz Decl. ¶¶ 10, 11).  The third-party Merchant and the Merchant Support Team are notified of the take-down, and the Merchant can dispute the "take-down" to the Content Management Team.  (Doc. 25-2; Chuang Decl. ¶¶ 20, 21, 22).

(6)    While the posting of Images by third -party merchants is initialized by the Merchants through an automated process, ContextLogic does exercise some gatekeeping function prior to an Image appearing on the Wish Website and Wish App,

enabling the creation of a "product detail page." (Doc. 25-1; Brydum Decl. ¶ 12 ("When a

Merchant wants to offer a new product for sale through the Wish App or the Wish

Website, the Merchant is responsible for sending ContextLogic, via an automated file

upload system, content related to the product. The submitted content is used to create

the 'product detail page' for the new post via an automated process.")); (Doc. 25-3; Xie

Decl. ¶ 3) (same).

(7)    ContextLogic gains financial benefit from the posting by Merchants of

Images on the Wish Website and Wish App, including allegedly infringing Images, in the

form of a commission on the sale of merchandise by the Merchant. E.g., (Doc. 25-2;

Chuang Decl. ¶ 13); (Doc 25-1 at 13; Terms of Service § 3).

(8)    ContextLogic directly uses Images, including allegedly infringing Images,

that are posted on the Wish Website, in its promotional material, including emails, splash

pages, and third party media posts such as Facebook. (Doc. 2-2; Charfoos Decl. ¶¶ 4, 5,

6); (Doc. 25-4; Kuntz Decl. ¶ 8 ); (Doc. 25-3; Xie Decl. ¶¶ 5-7).

(9)    If a product post is taken down, ContextLogic will cause the advertising

promotion of its post to cease "almost immediately." (Doc. 25-3; Xie Decl. ¶ 10).

However, ContextLogic is not always successful in accomplishing this goal. (See Doc 53

at attached exhibits); (Doc. 54-2; Xie Decl. (2) ¶ 12)

(10)   Though ContextLogic takes the position that it requires a copyright holder to

provide a URL address with its take-down notice in order to successfully locate and take

down the allegedly infringing Image, (Doc. 2-16 at 2-3); (Doc. 25 at 17-18), the March

2016 Notification, which included URL addresses for Images, and also included variant

Images without URL addresses, provided a "representative list" of alleged copyrighted

42

works appearing on the Website, see 17 U.S.C. § 512(C)(3)(A)(ii), and was sufficient for ContextLogic to act.  ContextLogic immediately ordered the take-down of all the posts noticed, and by August 2, 2016, it had ordered the take-down of 17,035 posts that it identified using its newly developed "fingerprint" technology, based upon 34 Images that Venus has identified to be allegedly infringing.  (Doc, 25-1; Brydum Decl. ¶¶ 36, 37); (see also Doc. 40; Transcript at 9-10 (Venus contends that the March Notice did not contain URL addresses)).

(11)    The evidence in the record supports a finding that ContextLogic has indeed acted to take-down thousands of Venus's copyrighted Images, which were the same Images that were included in Venus's take-down notices.  (Doc. 25-1; Brydum Decl. ¶¶ 36, 37).

(12)    ContextLogic is building a catalog of Venus's Images based on Venus's previous take-down requests, and is creating an Image match system that will fingerprint the Images and automatically prevent merchants from uploading these same Images in the future.  (Doc. 2-16 at 2-3); (Doc. 25-1; Brydum Decl. ¶¶ 30, 34-38).

(13).    While initially contending that the posting of Images on promotional materials such as emails, Facebook, and login pages was fully automated, ContextLogic now asserts that it has developed its technology to prevent the use of Images on promotional materials that are the subject of a take-down request.  See (Doc. 2-16 at 2); (Doc. 54 at 2); (Doc. 54-2; Xie Decl. (2) ¶ 12)).

(14)    Images which appear on the Wish Website or in promotional materials subsequent to a notice by Venus, and a take-down order by ContextLogic, while not the exact same Image previously noticed by Venus and removed by ContextLogic, are often

a slight reconfiguration of those Images, with changes in color, cropping, or transposition,

and are substantially or strikingly similar to Venus's noticed copyrighted Images.  See

Olem Shoe Corp. v. Washington Shoe Corp., 591 F. App'x 873, 885 (11th Cir. 2015)

("Where two works are 'essentially' or 'virtually identical,' they are strikingly similar and,

thus, the copying element is satisfied (citing Segrets, Inc. v. Gillman Knitwear Co., 207

F.3d 56, 62 (1st Cir.2000)); Baby Buddies, Inc. v. Toys R Us, Inc., 611 F.3d 1308, 1315

(11th Cir. 2010) ("To determine whether an allegedly infringing work is substantially

similar to a copyrighted work, we ask whether an average lay observer would recognize

the alleged copy as having been appropriated from the copyrighted work." (internal

quotation marks and citation omitted)).[14]

(15)    ContextLogic contends that it is not required to search its Website for

possible infringing Images.  (Doc. 44 at 3-4 (citing 17 U.S.C. § 512(m)).

(16)    ContextLogic has presented no evidence establishing that it cannot or that

its is burdensome to advance its technology to scan for reconfigured Images, specifically

made different by color, transposition, or cropping.   ContextLogic states that it "will use

its software 'in an effort to identify additional posts using the images Venus has

identified,' without limitation to the number of images, the format in which those images

may appear in a particular post, or when those images are first identified to ContextLogic

as appearing in Wish Posts or promotional materials."  (Doc. 44 at 8 (citing (Doc. 25-1;

Brydum Decl. ¶ 38)); (But see Doc. 25-4; Kuntz Decl. ¶ 17 (saying that "the new software

will not identify a second image as being the same as an image contained in a post that

---

[14]    ContextLogic concedes 24 identical Images did subsequently appear.  (Doc. 44 at 5).

was taken down if that second image has be altered . . . .")).

(17)    There is no evidence in the record of repeat Merchant infringers among the 110,000 Merchants who are posting items on the Wish Website, or that ContextLogic has failed to apply its takedown policy or has failed to reasonably implement a policy that provides for the termination in appropriate circumstances of recidivist Merchants who re-post allegedly infringing Images.  Likewise, there is no evidence that ContextLogic indeed tracks repeat infringers, or has blocked access to the Wish Website by repeat infringers.

(18)    ContextLogic has in place a procedure for Merchants to contest the take-down of an Image.

## A.   **Likelihood of Success on the Merits**

### 1.   **Direct Copyright Infringement**

Plaintiff must satisfy two requirements to establish direct copyright infringement; 1) it must show ownership of the allegedly infringed material; and (2) it must demonstrate that the alleged infringer, ContextLogic, violated at least one exclusive right granted to Venus as copyright holder, under 17 U.S.C. § 106.  See 17 U.S.C. § 501(a) (infringement occurs when the alleged infringer engages in an activity listed in § 106).  "[I]n imposing liability upon an internet service provider for third-party users' uploading of copyrighted material, Plaintiff must establish that Defendants engaged in a volitional act to cause the illegal copying.  To find otherwise would impose liability upon an otherwise passive internet service provider for conduct that is simply out of its control."  Hydentra HLP Int. Ltd. v. Luchian, No. 1:15-cv-22134-UU, 2016 WL 5951808, at *9 (S.D. Fla. June 2, 2016). The parties do not dispute, and the evidence in the record supports a finding that Venus has 5,411 registered copyrighted Images, and that at least some of the Images have

45

appeared on the Wish Website without Venus's authorization.   Additionally, the parties

do not dispute that ContextLogic is not directly liable merely for providing the Wish

Website as a conduit of information, which includes allegedly infringing Images.  See,

e.g., CoStar Grp., Inc., 373 F.3d at 550-51.

Venus contends that ContextLogic is directly liable for infringement because it

uses Infringing Images in its promotional emails to users; it posts Infringing Images on the

"splash screen" or login page that is shown when a user goes to the Wish.com website;

and it contracts with website operators and online advertising exchanges to display

product advertisements on third-party websites relating to the sale of products through

the Wish app or website.  (Doc. 45 at 9 (citing Doc. 2-2 at 3); (Doc. 25-3; Xie Decl. ¶¶ 7-

9).  Venus argues that "ContextLogic is directly infringing because its own copying and

transmittal of the Infringing Images are both driving customers to the wish.com website to

buy items from Wish and are generating transaction fees that go directly to Wish."  (Doc.

53 at 2).

ContextLogic argues that under the Milo & Gabby decision, Milo & Gabby, LLC v.

Amazon.com, Inc., No. C13-1932RSM, 2015 WL 4394673, at *1 (W.D. Wash. July 16,

2015), appeal filed No. 16-1290 (Fed. Cir. Dec. 7, 2015), ContextLogic is not a direct

infringer because the Images are "passively" and automatically by algorithm transferred

from the Wish Website to ContextLogic's promotional material, and third-party providers

such as Facebook pursuant to contract.  ContextLogic contends that it is not "copying"

the copyrighted Image, and thus is not a direct copyright infringer.  (Doc. 40; Transcript at

34-42, 65-66); (Doc. 37-1 at 16).  In Milo & Gabby, the court held that service provider

Amazon.com, Inc. was not liable for direct infringement because "the evidence in the

record demonstrates that the content of the detail pages and <u>advertisements</u> [by Amazon] was supplied by third parties via an automated file upload system, and did not originate from Amazon." <u>Milo & Gabby</u>, 2015 WL 4394673, at *1; (<u>see also</u> ((Doc. 35 at 18; Shanbhag Decl. ¶¶ 2-4).

ContextLogic's automated algorithm argument is belied by ContextLogic's more recent assertion that it can and will block re-postings in promotional materials of Images which have been the subject of a take-down. ContextLogic acknowledges that it has developed software, later improved in September, that will automatically remove from its promotional materials and third-party cites, any Image that has been taken down. The Court does not accept ContextLogic's defense that the automated system and algorithm which it created excuses it from having to cease using the Noticed Images in its own promotional materials, and contracting with third party providers to continue to display the Images. <u>See generally</u> <u>In re Aimster Copyright Litig.</u>, 252 F. Supp. 2d 634, 651 (N.D. Ill. 2002), <u>aff'd</u>, 334 F.3d 643 (7th Cir. 2003). While "passive, automatic acts engaged in through a technological process initiated by another" do not constitute "direct infringement," <u>ALS Scan, Inc.</u>, 239 F.3d at 622, ContextLogic itself created the automated environment where copyright infringement can multiply and spread through ContextLogic's own promotional material and by contract to third party providers, all for the benefit of ContextLogic. This active engagement, moving the Images from the Wish Website to materials created and generated by ContextLogic, or by contract to third party providers shows ContextLogic's volition and transforms ContextLogic from a "'passive provider[] of a space to [an] active participant[] in the process of copyright infringement,'" <u>Milo & Gabby</u>, 2015 WL 4394673, at *6 (quoting <u>Perfect 10, Inc. v. Cybernet Ventures,</u>

47

Inc., 213 F. Supp. 2d 1146, 1168 (C.D. Cal. 2002)); see also Live Face on Web, LLC v.

Tweople, Inc., No. 6:14-cv-44-Orl-22TBS, 2014 WL 12611358, at *3 (M.D. Fla. June 23,

2014) (finding that complaint stated a claim for direct copyright infringement where it

alleged that "each visitor 'is distributed a copy of the infringing code'"); Perfect 10, Inc. v.

Cybernet Ventures, Inc., 213 F. Supp. 2d at 1168-69 (finding no likelihood of success on

a claim of direct infringement where the evidence establishes that service provider "does

not use its hardware to either store the infringing images or move them from one location

to another for display."); Playboy Enters., Inc. v. Russ Hardenburgh, Inc., 982 F. Supp.

503, 512 (N.D. Ohio 1997) (finding direct infringement where operators had policy of

encouraging subscribers to upload files, including copyrighted adult photographs, onto

the system, and policy of using screening procedure in which employees viewed all files

in the upload file and moved them into the generally available files for subscribers).

 Venus has established a substantial likelihood of success in prevailing on the

merits of its claim of direct copyright infringement based on Venus's direct use and

reproduction of Venus's Images for promotional purposes and in contracts with third

parties.

**2. Contributory Copyright Infringement**

 ContextLogic contends that Venus cannot prevail on its claim of contributory

copyright infringement because it cannot establish that ContextLogic had actual

knowledge of specific infringing material and the ability to take simple steps to prevent

further damage, yet continued to provide access to infringing works.  ContextLogic argues

that it is protected from liability for contributory copyright infringement by the safe harbor

provision of the DMCA because it has adopted a policy and procedure for termination of

48

users of its system that are repeat infringers, and because it did not have any actual or apparent knowledge of alleged copyright infringement upon which it did not act.

To prevail on its claim of contributory copyright infringement, Venus must establish that ContextLogic intentionally or knowingly contributed to the direct infringement by a third party, here the Merchants posting on the Wish Website and Wish App.  See Optimum Techs., Inc., 496 F.3d at 1245.  "The standard of knowledge is objective: 'Know, or have reason to know.'"  Casella v. Morris, 820 F.2d 362, 365 (11th Cir. 1987) (quoting Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir.1971)); see also Cable/Home Commc'n Corp. v. Network Prods., Inc., 902 F.2d 829, 845-46 (11th Cir. 1990).[15]  Thus, while not provided with specific Notice of the URL addresses of the 17,035 Images that ContextLogic was able to take down, ContextLogic nonetheless has "reason to know" of the continued Images which have appeared and no doubt will appear on the Wish Website in the future, as well as the indeterminate number of slightly altered but readily identifiable substantially similar Images to those noticed that remain.  Hendrickson v. eBay, Inc., 165 F. Supp. 2d at 1090 (noting that "there may be instances where a copyright holder need not provide [the service provider] with specific item numbers to satisfy the [DMCA] identification requirement," though the record before the court indicated that specific item numbers were necessary to enable the service provider to identify problematic listings); see generally 17 U.S.C. § 512(c)(3)(A)(11) and (iii) (requiring notice under the DMCA to be a "representative list" of infringing works and provide "information reasonably sufficient to permit the service provider to locate the

---

[15]   The objective knowledge required for contributory infringement is consistent with the DMCA's knowledge requirement which measures apparent or "red flag" knowledge by the objective hypothetical "reasonable person" standard.  See UMG Recordings, 718 F.3d at 1125-26; 17 U.S.C. § 512(c)(1)(A)(ii).

material"). "[I]f a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement." Perfect 10, 508 F.3d at 1171 (quotation marks and citation omitted). ContextLogic contributes to the infringement of Venus's copyrighted Images by providing the software and support services for third- party Merchants to continue to post infringing Images, and while attempting to shield itself (and the Merchants) with a fully automated website. Without ContextLogic's services, the third-party Merchants would have to find some other way to attempt to sell products using Venus's copyrighted Images. See In re Aimster Copyright Litig., 252 F. Supp. 2d at 651-52.

"'[I]n general, contributory liability is based on the defendant's failure to stop its own actions which facilitate third-party infringement.'" Luvdarts, LLC v. AT & T Mobility, LLC, 710 F.3d 1068, 1071 (9th Cir. 2013) (quoting Perfect 10, 508 F.3d at 1175). A service provider's failure to implement a "digital rights management system may be used as circumstantial evidence of 'the object of promoting' infringement," establishing contributory copyright liability. Id. at 1071-72. For example, in Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d at 1173, the court held that an Internet search engine operator could be held liable on copyright owner's contributory copyright claim if the evidence establishes that the operator had knowledge that infringing images were available using its search engine, could take measures to prevent further damage to the copyrighted works, and failed to take such steps. 508 F.3d at 1173. Also instructive is the relatively early and influential decision in Religious Tech. Ctr. v. Netcom On Line Commc'n Servs., Inc., 907 F. Supp. 1361 (N.D. Cal. 1995) ("Netcom"). As described by

50

the Ninth Circuit in <u>Perfect 10, Inc. v. Amazon.com, Inc.</u>, <u>supra</u>, in <u>Netcom</u>,

> a disgruntled former Scientology minister posted allegedly
> infringing copies of Scientological works on an electronic
> bulletin board service. <u>Netcom</u>, 907 F.Supp. at 1365-66.  The
> messages were stored on the bulletin board operator's
> computer, then automatically copied onto Netcom's computer,
> and from there copied onto other computers comprising "a
> worldwide community" of electronic bulletin board systems. <u>Id.</u>
> at 1366-67 & n. 4 (internal quotation omitted).  <u>Netcom</u> held
> that if plaintiffs could prove that Netcom <u>knew or should have</u>
> <u>known that the minister infringed plaintiffs' copyrights, "Netcom</u>
> <u>[would] be liable for contributory infringement since its failure</u>
> <u>to simply cancel [the former minister's] infringing message and</u>
> <u>thereby stop an infringing copy from being distributed</u>
> worldwide <u>constitute[d] substantial participation</u> in [the former
> minister's] public distribution of the message." <u>Id.</u> at 1374.

<u>Perfect 10</u>, 508 F.3d at 1171-72 (emphasis added).

On this record, Venus has established a likelihood of success in prevailing on its

contributory infringement claim.  <u>See generally</u> <u>Napster, Inc.</u>, 239 F.3d 1004, <u>as amended</u>

(Apr. 3, 2001) (finding that plaintiff established a likelihood of success on its contributory

infringement claim against service provider where service provider had actual knowledge

that specific infringing material was available on its system, it could block access to the

system by suppliers of the infringing material, it failed to remove the material, and it

materially contributed to the direct infringement by third parties by providing the site and

facilities for direct infringement).  The record establishes that ContextLogic has the ability

to implement a "fingerprint" review system of the Wish Website to capture not only

specifically noticed Images, but also identical and substantially similar allegedly infringing

Images.  ContextLogic's resistance or failure to implement this system provides

circumstantial evidence that it is intentionally or knowingly contributes to the direct

infringement by a third party.

### 3.    Vicarious Copyright Infringement

Vicarious copyright infringement is established when a defendant has the right and ability to supervise and control infringing activity and also has a direct financial interest in such activities. See BUC Int'l Corp., 489 F.3d at 1138 n.19.  "The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits.  Ellison v. Robertson, 357 F.3d 1072, 1079 (9th Cir. 2004) (emphasis omitted).  Vicarious liability does not require that the defendant have knowledge of the infringement.  Buc Int'l Corp., 489 F.3d at 1138 n.19 (citing Grokster, 545 U.S. at 931 n. 19).  "'[V]icarious liability is based on the defendant's failure to cause a third party to stop its directly infringing activities.'"  Disney Enters., Inc., 2013 WL 6336286, at *38 (quoting Perfect 10, 508 F.3d at 1175).

ContextLogic argues that Venus cannot establish a likelihood of success on the merits of its vicarious liability claim because in the context of an online marketplace, the right and ability to supervise means more than the mere ability to take down a particular post made by a third-party merchant.  Rather the control must extend to the ability of the service provider to alter the third-party merchant's conduct.  ContextLogic cites to Hendrickson, 165 F. Supp. 2d at 1093 as support.  In Hendrickson, the court found the ability to remove or block access to materials posted on its website does not constitute "control," and the service provider's "voluntary practice of engaging in limited monitoring of its website for 'apparent' infringement" did not constitute "control."  Id. at 1093-94.

In re Aimster Copyright Litig., 252 F. Supp. 2d at 655-56, the court held otherwise,

finding that the defendant service provider operating a file sharing service could be held

vicariously liable for copyright infringement of music copyrights because the defendant

posted terms of service to the file sharers which included the provision that the provider

had the right to terminate individual users, take down infringing material, and block

access to repeat copyright violators.  252 F. Supp.2d at 655.  "The ability to block

infringers' access to a particular environment for any reason whatsoever is evidence of

the right and ability to supervise."  Napster, 239 F.3d at 1023-24.  "The determination of

whether a defendant has the capacity to halt infringement is determined by examining the

system's 'current architecture.'"  Disney Enters., Inc., 2013 WL 6336286, at *38 (quoting

Napster, 239 F.3d at 1024); see also Luvdarts, 710 F.3d at 1071.  The record establishes

that ContextLogic has indeed developed and is capable of implementing a "fingerprinting"

system that can automatically scan the Wish Website for Images, both identical, and

substantially similar to Images about which it has received notice, and initiate a take-

down of those Images.  See generally Luvdarts, LLC, 710 F.3d at 1072 (finding no

vicarious liability where plaintiff did not explain how the defendant service provider could

implement a system of "digital rights management.").

        As to ContextLogic's direct financial interest, it is undisputed that ContextLogic

realizes a commission from the sale of merchandise by Merchants on the Wish Website

or through the Wish App.  Additionally, "[f]inancial benefit exists where the availability of

infringing material 'acts as a draw' for customers."  Napster, 239 F.3d at 1023 (quoting

Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 263-64 (9th Cir. 1996)).  The record

before the Court demonstrates that Venus has a likelihood of success in establishing the

requirements for vicarious copyright infringement.

### 4.      The Digital Millennium Copyright Act ("DMCA")

By passing the DMCA, "it was not the intention of Congress that a copyright owner

could write one blanket notice to all service providers alerting them of infringing material,

thus, relieving him of any further responsibility and, thereby, placing the onus forever on

the [service provider].  However, it is, also, against the spirit of the DMCA if the entire

responsibility lies with the copyright owner to forever police websites in search of possible

infringers."  Hendrickson v. Amazon.Com, Inc., 298 F. Supp. 2d at 917.  It is for this Court

to find the proper balance between these competing interests.  "[W]here the

§ 512(c)(1)(B) safe harbor requirements are not met, the service provider loses protection

with regard to any infringing activity using the service."  Columbia Pictures Inds., Inc., 710

F.3d at 1046.

### a)      Qualified Service Provider

The parties do not dispute that ContextLogic qualifies under the DMCA as a

service provider that stores users' material on its system. A "service provider" is defined

as "a provider of online services or network access, or operator of facilities therefor. . . "

that offers or provides "connections for digital online communications . . . of material of

the user's choosing, without modification to the content of the material as sent or

received."  17 U.S.C. § 512(k)(1)(A) and (B).  See UMG Recordings, 718 F.3d at 1019-20

& n.9.

ContextLogic performs precautionary protective tasks required by § 512, including

implementing a system to receive take-down requests from copyright holders, and order

the take-down of the allegedly infringing Images.  It has a nine-person Content

Management Team to respond to and analyze  "take-down" requests and for monitoring

new posts, and has also implemented a computerized "fingerprint" system to search the

Wish Website for other postings of the allegedly infringing Noticed Images.  Moreover,

based upon the evidence available at this juncture it appears that this system can be

programmed to identify Images that differ from the originally Noticed Images to the extent

that they differ in color; are transposed (ie., a mirror image facing the other direction); or

are cropped to omit some portion of the originally Noticed Image (such as a head or an

arm).

### b)    Actual or Apparent ("Red Flag") Knowledge

"On the issue of disqualifying knowledge, however, the burden falls on the

copyright owner to demonstrate that the service provider acquired knowledge of the

infringement, or of facts and circumstances from which infringing activity was obvious,

and failed to promptly take down the infringing matter, thus forfeiting its right to the safe

harbor."  Capitol Records, LLC v. Vimeo, LLC, 826 F.3d at 95.   "'[T]he actual knowledge

provision turns on whether the provider actually or "subjectively" knew of specific

infringement, while the red flag provision turns on whether the provider was subjectively

aware of facts that would have made the specific infringement 'objectively' obvious to a

reasonable person.'"  Columbia Pictures Indus., 710 F.3d at 1043 (quoting Viacom Int'l,

Inc. v. YouTube, Inc., 676 F.3d at 31).

As to actual knowledge,

> [T]he DMCA's protection of an innocent service provider
> disappears at the moment the service provider loses its
> innocence, i.e., at the moment it becomes aware that a third
> party is using its system to infringe.  These provisions of the
> DMCA are designed to deny safe harbor protection to Internet
> service providers operating or linking to pirate sites whose
> illegal purpose is obvious to a reasonable person.

> Nevertheless, there are two important limitations on disqualification. First, Section 512(m) specifies that a service provider has no duty to monitor activity occurring on its service or to "affirmatively seek facts indicating infringing activity," which informs the knowledge analysis. 17 U.S.C. § 512(m). Second, because the statute elsewhere imposes the requirement that providers remove every piece of material identified as infringing, general awareness of rampant infringement is not enough to disqualify a service provider of protection.  Instead, the section requires knowledge or awareness of specific infringing activity.

Disney Enters., Inc., 2013 WL 6336286, at *26-27 (internal quotation marks and citations omitted).

Venus contends that the notice of infringement that it provided to ContextLogic, which included screenshots of the allegedly infringing Images and some of the actual URL addresses, (see Docs. 2-12, 2-15), "adhere[d] to the requirements of § 512(c)(3)" of the DMCA.  (Doc. 45 at 7).  ContextLogic was able to promptly take down 16 posts identified by Venus in March 2016.  (Doc. 25-1; Brydum Decl. ¶ 23).  After June 1, 2016, ContextLogic used its "fingerprint" software to screen new posts for possible use of the 34 Images that Venus identified in March 2016, and that as a result, ContextLogic identified and took down 17,035 posts using this technology by August 2, 2016.  (Doc. 25-1; Brydum Decl. ¶¶ 36-37).  However, the Images identified by Venus's attorney Charfoos on June 1, 2016, "was a post that was different from any other identified" by Venus in March 2016.  Id. ¶ 25.

Considering ContextLogic's fingerprint technology in place by June 2016, ContextLogic arguably had actual knowledge of all of those Images noticed by Venus in March 2016 and taken down by ContextLogic, including both identical Images and

reconfigured substantially similar and clearly recognizable Images.  But even if actual

knowledge cannot be ascribed to ContextLogic, Venus has made a showing of a

likelihood of success in establishing that ContextLogic had objective "red flag" knowledge

prior to the filing of this lawsuit and thereafter, of Images noticed in March 2016, but

found months later on the Wish Website.

> [I]n order to be disqualified from the benefits of the safe harbor
> by reason of red flag knowledge under § 512(c)(1)(A)(ii), the
> service provider must have actually known facts that would
> make the specific infringement claimed objectively obvious to
> a reasonable person.
>
>> The difference between actual and red flag knowledge
>> is . . . not between specific and generalized knowledge,
>> but instead between a subjective and an objective
>> standard. In other words, the actual knowledge
>> provision turns on whether the provider actually or
>> 'subjectively' knew of specific infringement, while the
>> red flag provision turns on whether the provider was
>> subjectively aware of facts that would have made the
>> specific infringement 'objectively' obvious to a
>> reasonable person. . . .
>
> The hypothetical "reasonable person" to whom infringement
> must be obvious is an ordinary person - not endowed with
> specialized knowledge or expertise concerning [copyrighted
> Images] or the laws of copyright.   Furthermore, as noted
> above, § 512(m) makes clear that the service provider's
> personnel are under no duty to "affirmatively seek[ ]"
> indications of infringement.

Capitol Records, LLC v. Vimeo, LLC, 826 F.3d at 93-94 (quoting Viacom Int'l, 676 F.3d at

31.  Here, the reappearing allegedly infringing and Noticed Images, even if altered by

color, cropping, or transposition, are readily apparent to the objectively reasonable lay

person's eye.

Notification must identify the material that is claimed to have been infringed and

include a "representative list" and "information reasonably sufficient to permit the service provider to locate the material."  17 U.S.C. §§ 512(c)(3)(A)(ii) and (iii).  While an informal email or a spread sheet of thumbnail photographs is not sufficient notice under the DMCA, see UMG Recordings, Inc., 718 F.3d at 1024-25 ("[I]nformal email failed to meet" the requirements of § 512(c)(3) notice, though it could possibly satisfy "red flag" notice.); Luvdarts, LLC, 710 F.3d at 1073 (explaining that the DMCA precludes "vague" notices), nothing in the DMCA requires the copyright holder to provide a URL address for every Image due to be taken down into the future, once sufficient Notice has been provided that the particular Image, as pinpointed on the website by an address, infringes on a copyright.  See generally In re Aimster Copyright Litig., 252 F. Supp. 2d at 659.  Venus is not required to identify and give repeated notice each and every time a Noticed Image, whether identical or substantially similar, appears on the Wish Website; rather notice of an Image charges ContextLogic with knowledge of that Image as it appears on the Website at the time of the Notice and into the future, whether identical or slightly altered as to color, configuration or by cropping, and substantially similar and readily identifiable See ALS Scan, Inc., 239 F.3d at 625 ("The notification requirements are relaxed to the extent that, with respect to multiple works, not all must be identified - only a 'representative' list." (citing 17 U.S.C. § 512(c)(3)(A)(ii))).  Imposing such a routine search requirement on ContextLogic does not run afoul of the DMCA's admonition that the provider is not required to continuously monitor its servers for infringement, 17 U.S.C. § 512(m) inasmuch as it imposes only a limited and targeted duty to use its "fingerprint" software to search for known infringing Images as opposed to an "'amorphous' duty to monitor in contravention of the DMCA."  EMI Christian Music Grp., Inc., 844 F.3d at 93.

58

Because the March 2016 Notice was sufficient with regard to both identical Images and substantially similar Images, and ContextLogic was subjectively aware of facts that would have made the Merchants' direct infringement objectively obvious to a reasonable person, ContextLogic is not eligible for the § 512(c) safe harbor defense as to those Images properly Noticed to date and in the future.  Venus has established a likelihood of success of establishing that ContextLogic has actual or apparent knowledge of those allegedly infringing Images about which Venus has provided sufficient notification and which ContextLogic has failed to remove from the Wish Website and Wish App.

### c)    Financial Benefit

"A service provider is eligible for the § 512(c) safe harbor only if it 'does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity.'" UMG Recordings, Inc., 718 F.3d at 1026 (quoting 17 U.S.C. § 512(c)(1)(B)).  The fact that ContextLogic receives a commission on sales made by the Merchants through the Wish Website and Wish App, including from Merchants selling garments using allegedly infringing Images, means that ContextLogic receives a "financial benefit directly attributable to the infringing activity." Additionally, ContextLogic directly profits from its use of the infringing Images by contracting with third party providers such as Facebook, and by reproducing the allegedly infringing Images in its own promotional materials in an effort to draw customers to its website and "app."  See Columbia Pictures Inds., Inc., 710 F.3d at 1045.  This disqualifies ContextLogic from asserting the § 512(c) safe harbor defense.

### d)   Right and Ability to Control

Under the DMCA, a service provider loses safe harbor protection if it "has the right and ability to control" third party infringers, such as the infringing Merchants in this case, and fails to act.  17 U.S.C. § 512(c)(1)(B).  ""[I]n order to have the right and ability to control, the service provider must exert substantial influence on the activities of users," UMG Recordings, Inc., 718 F.3d at 1030 (internal quotations and citations omitted).  This requires "something more" than the right and ability to locate infringing material, remove an infringing Image posted on the service provider's website, and terminate a users' access. See UMG Recordings, Inc., 718 F.3d at 1027, 1030; Columbia Pictures Inds., Inc., 710 F.3d at 1045; Viacom Int'l, Inc., 676 F.3d at 38.  "Congress could not have intended for courts to hold that a service provider loses immunity under the safe harbor provision of the DMCA because it engages in acts that are specifically required by the DMCA to obtain safe harbor protection.  UMG Recordings, Inc., 718 F.3d at 1027 (internal quotation marks and citation omitted).

Beyond "take-downs" and the right to exclude a Merchant under ContextLogic's Terms of Service,  terms and conditions of use, the evidence in this record does not establish that ContextLogic exerts a substantial influence on the activities of the Merchants' conduct, given that the Merchants continue to post infringing Images in significant numbers.  See UMG Recordings, Inc., 718 F.3d at 1026.  Likewise, ContextLogic's voluntary action of developing search mechanisms and scanning the Wish Website for possibly infringing Images does not require a finding that it has the "right and ability" to control the Merchants' conduct as defined by the DMCA. See Hendrickson, 165 F. Supp.2d at 1093-94.

60

### e)   Expeditious Response and Repeat Infringer Policy

"To be eligible for immunity from monetary relief under any of the DMCA's four safe harbor categories, a service provider must demonstrate that it 'has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers[.]'"  Capitol Records, LLC v. Escape Media Grp., Inc., No. 12-CV-6646 (AJN), 2015 WL 1402049, at *45 (S.D.N.Y. Mar. 25, 2015) (quoting 17 U.S.C. § 512(i)(1)(A)).  See generally In re Aimster Copyright Litig., 334 F.3d 643, 655 (7th Cir. 2003) ("The [DMCA] does not abolish contributory infringement.  The common element of its safe harbors is that the service provider must do what it can reasonably be asked to do to prevent the use of its service by 'repeat infringers.'" (citing 17 U.S.C. § 512(i)(1)(A).).  "'[A]n implementation is reasonable if, under "appropriate circumstances," the service provider terminates users who repeatedly or blatantly infringe copyright.'" Disney Enters., Inc., 2013 WL 6336286, at *20 (quoting Perfect 10, Inc. v. CCBill LLC, 488 F.3d at 1109).  The DMCA's requirement for the establishment and implementation of a repeat infringer policy, 17 U.S.C. § 512(i), must be evaluated in conjunction with its admonition that a service provider has no duty to monitor for possible copyright infringement "except to the extent consistent with a standard technical measure," meaning available "technical measures that are used by copyright owners to identify or protect copyrighted works" that "do not impose substantial costs on service providers, or substantial burdens on their systems or networks."  17 U.S.C. §§ 512 (i)(2) and (m).  Specifically,

61

> the safe harbor expressly disclaims any affirmative monitoring
> requirement - except to the extent that such monitoring
> comprises a "standard technical measure" within the meaning
> of § 512(i).  Refusing to accommodate or implement a
> "standard technical measure" exposes a service provider to
> liability; refusing to provide access to mechanisms by which a
> service provider affirmatively monitors its own network has no
> such result.

Viacom Int'l, Inc., 676 F.3d at 41.

While a court should not construe the DMCA as requiring "affirmative action on the

part of the service provider to monitor for infringement," a "reasonable [repeat infringer]

policy must be capable of tracking infringers," Disney Enters., Inc., 2013 WL 6336286, at

*20-21; see UMG Recordings, Inc., 718 F.3d at 1024.  The District Court for the Southern

District of Florida, in one of the few decisions in this Circuit examining the DMCA,

adopted the standard set by the Ninth Circuit:

> [A] service provider must maintain a vehicle to receive notices
> of potential infringement, design its system so as to be able to
> ascertain the identity of the users responsible for those files,
> and make some effort to record infringing users. . . . Without
> those threshold functions, service providers are unable to
> carry out any sort of reasonable policy.

Disney Enters., Inc., 2013 WL 6336286, at *21 (quoting Perfect 10, Inc. v. CCBill, LLC,

488 F.3d at 1110).  To this end, a repeat infringer policy under the DMCA must include

"adequate recordkeeping" to enable the identification of repeat infringers.  Capitol

Records, 2015 WL 1402049, at *7.

Even though Venus has not identified a single repeat offender, ContextLogic has

not provided any evidence of the efficacy of its repeat infringer policy, and asserts that it

cannot or will not scan the Wish Website to locate slightly altered but nevertheless

identifiable infringing Images about which it has received sufficient notice.  Nor has

ContextLogic demonstrated a capability of tying Notices to repeat infringers, or of

identifying whether the Merchant posting the allegedly infringing Image is indeed a repeat

offender.  See Disney Enters., Inc., 2013 WL 6336286, at *21.

Based upon the record developed thus far, the Court determines that it is

reasonable and in accordance with standard technical measures for ContextLogic to track

Merchants who repeatedly display infringing Images of which ContextLogic has received

sufficient notice, and that it is not unreasonably burdensome to require ContextLogic to

extend its repeat infringer policy to Merchants who post readily identifiable and

substantially similar Images that differ from Noticed Images only to the extent that they

are a different color; are transposed, or are cropped to omit some portion of the originally

Noticed Image.  ContextLogic has not presented any evidence that it has implemented a

repeat infringer policy.  See EMI Christian Music Grp., Inc., 844 F.3d at 91 ([the service

provider] would simply have had to make use of information already within its possession

and connect that information to known users.).

Venus has demonstrated a substantial likelihood of success on this record

establishing that ContextLogic does not meet all of the criteria necessary for safe harbor

protection under 17 U.S.C. § 512(c).

### B.    Irreparable Harm

An injury is "irreparable" only if it cannot be undone through monetary remedies.

Ferrero v. Assoc. Materials Inc., 923 F.2d 1441, 1449 (11th Cir.1991) (citation omitted).

"[T]he loss of customers and goodwill is an 'irreparable' injury."  Id. (citation omitted).  "[A]

sufficiently strong showing of likelihood of confusion caused by trademark infringement

may by itself constitute a showing of a substantial threat of irreparable harm."

McDonald's Corp. v. Robertson, 147 F.3d 1301, 1310 (11th Cir. 1998) (alterations,

internal quotation marks and citation omitted)).  ContextLogic's continued unauthorized

display of Venus's copyrighted Images on its Wish Website and Wish App will result in

immediate and irreparable injury to Venus if a preliminary injunction is not granted.  Here,

Venus has established consumer confusion to the detriment of Venus and its reputation

and financial interests, citing to published comments by consumers that they thought they

were purchasing a Venus product, based upon the Image appearing on the Wish

Website, but were disappointed to receive a "knock-off" product of inferior quality. (See

Doc. 2-1; Sheffler Decl. ¶ 13).  While irreparable harm may not be presumed when a

copyright holder establishes a likelihood of success on the merits, Venus has shown that

irreparable harm is "likely," not merely possible, in the absence of an injunction. See

Hoop Culture, Inc. v. GAP Inc., 648 F. App'x 981, 985 (11th Cir. 2016) (citing Winter v.

Nat. Res. Def. Council, Inc., 555 U.S. 7, 20-22 (2008)).  Venus does not have an

adequate remedy at law to prevent the impending consumer confusion and damage to its

products and reputation caused by continued infringement.

### C.     Balance of Harms and Public Interest

The public interest is served by upholding the rights of copyright owners,

"[o]therwise, the rationale for protecting copyright, that of encouraging creativity, would be

undermined."  Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1254 (3d

Cir. 1983).  "'The public interest can only be served by upholding copyright protection and

preventing the misappropriation of protected works.'"  C.B. Fleet Co. v. Unico Holdings,

Inc., 510 F. Supp. 2d 1078, 1084 (S.D. Fla. 2007) (citation omitted).  The public interest

favors issuance of a preliminary injunction against ContextLogic in order to protect the

integrity of Venus's copyright interests, and protect the public from the possibility of unwittingly purchasing unauthorized "knock-off" or counterfeit fashions when they thought they were purchasing a Venus product.  See CBS Broad., Inc. v. EchoStar Comm'ns Corp., 265 F.3d 1193, 1198 (11th Cir.2001) (finding that a preliminary injunction on a copyright claim serves the "public interest because the public interest lies with protecting the rights of copyright owners"); C.B. Fleet Co., 510 F. Supp. 2d at 1084 ("The public interest can only be served by upholding copyright protection and preventing the misappropriation of protected works."); Nailtiques Cosmetic Corp. v. Salon Sciences, Corp., No. 96-2709-CIV-NESBITT, 1997 WL 244746, at *5 (S.D. Fla. Jan.10, 1997) (consuming public has an interest in not being misled or deceived by infringing products). There is no indication that the public interest would be disserved by the issuance of a preliminary injunction against ContextLogic.

ContextLogic has not provided the Court with any evidence purporting to show its or its Merchants' rightful use of the allegedly infringing Venus Images of which it has received sufficient Notice, nor has it provided evidence that its business will be destroyed by a preliminary injunction.  See generally Napster, Inc., 239 F.3d at 1025 (affirming district court 's entry of preliminary injunction finding that "'[a]ny destruction of Napster, Inc. by a preliminary injunction is speculative compared to the statistical evidence of massive, unauthorized downloading and uploading of plaintiffs' copyrighted works. . . .""). While ContextLogic will be pressed to continue to apply its Content Management Team and software to implement Venus's take-down requests, and to monitor the Wish Website for future postings of unauthorized allegedly infringing Images, both identical and altered but sufficiently similar and clearly recognizable, of which it has received sufficient

Notice from Venus, this potential harm to ContextLogic is outweighed by the public

interest of maintaining the integrity of copyrights.  See Affordable Aerial Photography, Inc.

v. Nicklaus, No. 13-80254-CIV-RYSKAMP/ HOPKINS, 2013 WL 11522047, at *4 (S.D.

Fla. Oct. 8, 2013) ("Copyright law dictates that the harm an injunction might have on a

defendant's business merits little equitable consideration and is insufficient to outweigh

the continued wrongful infringement of asserted legal rights.").  Congress expressly

provides the district court with the authority to grant a preliminary injunction under the

Copyright Act "on such terms as it may deem reasonable to prevent or restrain

infringement of a copyright."  17 U.S.C. § 502(a).  Likewise, even if applicable as a

defense, the DMCA provides that Venus may be entitled to the limited injunction relief set

forth in 17 U.S.C. § 512(j).  Viacom Int'l, Inc. v YouTube, Inc., 676 F.3d 19, 41 (2d Cir.

2012).[16]

---

[16]   Three forms of injunctive relief are available under the DMAC:

> (i)  An order restraining the service provider from providing access to
> infringing material or activity residing at a particular online site on the
> provider's system or network.

> (ii)  An order restraining the service provider from providing access to
> a subscriber or account holder of the service provider's system or
> network who is engaging in infringing activity and is identified in the
> order, by terminating the accounts of the subscriber or account holder
> that are specified in the order.

> (iii) Such other injunctive relief as the court may consider necessary to
> prevent or restrain infringement of copyrighted material specified in the
> order of the court at a particular online location, if such relief is the least
> burdensome to the service provider among the forms of relief
> comparably effective for that purpose.

Wolk v. Kodak Imaging Network, Inc., No. 10 Civ. 4135(RWS), 2011 WL 940056, at *7 (S.D.N.Y. Mar.
17, 2011) (quoting 17 U.S.C. § 512(j)(1)(A)).

## VI.    Conclusion

Considering the above four factors and the limited record at this juncture in determining whether a preliminary injunction shall issue, this Court finds good cause to believe that ContextLogic has engaged in and is likely to engage in acts or practices that violate Section 501 of the Copyright Act, 17 U.S.C. § 501; that Venus has established a likelihood of success on the merits of its claims and that it will suffer irreparable harm to its business reputation, goodwill, and financial interests from ContextLogic's ongoing violations unless ContextLogic is restrained and enjoined by Order of this Court; and that public interest factors weigh in Venus's favor, overcoming the harm demonstrated by ContextLogic in complying with the provisions of this preliminary injunction. In light of the foregoing, the Court concludes that Venus has satisfied the requirements of Rule 65(a), Federal Rules of Civil Procedure, such that a preliminary injunction shall issue. The Court has considered the evidence in the record and the parties' arguments, as well as the developing body of law relating to this ever evolving and forward moving world of cyber commerce. Aspects of the preliminary injunction fashioned herein, which go beyond enjoining ContextLogic from continuing to directly infringe upon Venus's copyrights, take the form of a mandatory injunction, requiring Defendant ContextLogic to take action. "When a preliminary injunction is sought to force another party to act, rather than simply to maintain the status quo, it becomes a "'mandatory or affirmative injunction'" and the burden on the moving party increases." Haddad v. Arnold, 784 F. Supp. 2d 1284, 1295 (M.D. Fla. 2010) (quoting Exhibitors Poster Exch. v. Nat'l Screen

Serv. Corp., 441 F.2d 560, 561 (5th Cir.1971)).[17] "[M]andatory injunctions are to be sparingly issued and [only] upon a strong showing of necessity and upon equitable grounds which are clearly apparent." Fox v. City of West Palm Beach, 383 F.2d 189, 194 (5th Cir.1967); Miami Beach Fed. Savings and Loan Ass'n v. Callander, 256 F.2d 410, 415 (5th Cir.1958) ("A mandatory injunction . . . should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.").   The Court determines that Venus has made a clear showing of entitlement to such an injunction, and that compelling circumstances exist to warrant such a mandatory injunction, given the need to protect the copyrighted property of Venus, and the continuous posting of infringing Images on ContextLogic's Wish Website by third-party Merchants.  See Verizon Wireless Personal Commc'ns LP v. City of Jacksonville, Fla., 670 F. Supp. 2d 1330, 1346 (M.D. Fla. 2009).  To simply enjoin ContextLogic and require it to "maintain the status quo" would not begin to address the posting by Merchants of infringing Images on the Wish Website and Wish App that is certain to continue, and which would render Venus's copyrights meaningless.  Requiring ContextLogic to take the following additional measures, consistent with standard technical measures and pursuant to the multi-industry standards does not impose an unreasonable or substantial cost on ContextLogic and the Wish Website, and represents the least burdensome form of relief available to stop the continuing postings of infringing Images.  The Court recognizes that an Order granting a preliminary injunction "does not and cannot decide the merits of the case,"

---

[17]   Decisions of the Fifth Circuit handed down before September 30, 1981 are binding on the Eleventh Circuit.  Home Design Servs., Inc. v. Turner Heritage Homes Inc., 825 F.3d 1314, 1327 n.10 (11th Cir. 2016) (citing Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981), petition for cert. filed No. 16-858 (U.S. Dec. 21, 2016).

<u>Miami Beach Fed. Sav. & Loan Ass'n v. Callander</u>, 256 F.2d 410, 415 (5th Cir. 1958), and that a fully developed record at a later stage of these proceedings may paint a materially different picture. But at this juncture, the Court determines the following to constitute a reasonable preliminary injunction.

The Court encourages the parties to resolve this dispute and cooperate in the future as the drafters of the DMCA contemplated, rather than relying on this Court to referee every notice and response, and requiring the Court to micromanage an going dispute affecting the businesses of both parties. The Court notes that this case is set for a mediation conference on January 20, 2017 (<u>see</u> Doc. 58), and is optimistic that the mediation conference will prove fruitful.

## VII. <u>Bond</u>

In stridently representing their respective positions, the parties have taken divergent views of the amount of an appropriate bond. Venus argues that $10,000.00 is sufficient (Doc. 16 at 2; Doc. 32 at 16; Doc. 45 at 5-6), while ContextLogic contends that an injunction would jeopardize its entire business, requiring a bond in the amount of $100,000,000.00. (Doc. 25 at 25; Doc. 44 at 7). Neither position is helpful to the Court in setting a realistic and purposeful bond.

Pursuant to Rule 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongly enjoined or restrained." "[T]he amount of security required by the rule is a matter within the discretion of the trial court . . . [and] the court may elect to require no security at all." <u>BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC</u>, 425 F.3d 964, 971 (11th Cir. 2005).

An injunction bond "is intended to afford security only for those damages, if any, that

might be 'proximately caused by the [wrongful] issuance of [an] injunction.'" Int'l Equity

Invs., Inc. v. Opportunity Equity Partners Ltd., 441 F. Supp. 2d 552, 565-66 (S.D.N.Y.

2006) (citation omitted). Typically, a security bond is required when a court enters an

injunction which prevents commercial money-making activities. See Black Warrior

Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 297 F.R.D. 633, 634 (N.D. Ala. 2014)

(citing Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 426 (3d Cir.2010)).

The Court believes that a bond in the amount of $250,000.00 would cover any cost

to ContextLogic of implementing the requirements set forth in this preliminary injunction,

should this injunction be determined to be improvident and reversed on appeal. The

Court is of course, amenable to reconsideration of that amount after hearing more

specific evidence and legal argument from the parties to further refine the amount of the

bond.

It is hereby

**ORDERED**:

1.      Defendant ContextLogic's Motion to Take Judicial Notice (Doc. 35) is

**GRANTED**.

2.      Plaintiff's Application for Preliminary Injunction (Doc. 2) is **GRANTED IN

PART**, and ContextLogic shall be **PRELIMINARILY ENJOINED** as follows:

A.      ContextLogic shall, within five business days of the posting of a Bond

by Venus, achieve the take-down of all current allegedly Infringing Images that

have to date been sufficiently identified and noticed by Venus ("Noticed Images"),

using ContextLogic's software and Content Management Team to identify

70

additional **current posts** of the Noticed Images Venus has identified, without

limitation to the number of Images, the format in which those Images may appear

in a particular post, or when those Images are first identified to ContextLogic as

appearing on the Wish Website or Wish App.

"[W]ithout limitation to . . . the format in which those Images may

appear in a particular post" shall mean and encompasses all Images that

are identical to the originally Noticed Images, as well as those Images that

are substantially similar to the Noticed Images and readily identifiable,

differing from the originally Noticed Images only to the extent that they are a

different color; are transposed (ie, a mirror image facing the other direction);

or are cropped to omit some portion of the originally Noticed Image (such as

a head, an arm, or a leg).

"Sufficient notification" by Venus shall consist of a signed and dated written

notification by an authorized individual, that identifies the Venus sender by

position, address and phone number, and depicts a clear representation of the

allegedly Infringing Image as it appears on the Wish Website or Wish App, along

with the URL address, coupled with a copy of the actual copyrighted Image with its

copyright identification.  The 34 Images identified by Venus in March 2016, as

discussed in this Record, shall be deemed "sufficiently noticed."  (See e.g. Doc.

25-1; Brydum Decl. ¶¶ 36, 37).

B.    ContextLogic shall continue to keep and maintain current

screening measures and software in place and use that software and its

Content Management Team to identify all **new and future posts** uploaded

71

to the Wish Website in order to identify and achieve the take-down of those
Images that allegedly infringe upon Venus's copyright that Venus has, to
date, and in the future, provided sufficient notification to ContextLogic,
without limitation to the number of Images, the format in which those
Images may appear in a particular post, or when those Images are first
identified to ContextLogic as appearing on the Wish Website or Wish App.
(See Doc. 44 at 4 (ContextLogic's Supp. Brief)).

C.     Upon sufficient Notice by Venus in the **future** of an Infringing
Image, ContextLogic shall identify and achieve the take-down that same
Noticed Image within 48 hours of that Notice, and all other posts containing
that Image that may appear on the Wish Website or Wish App within five
business days of that Notice, without limitation to the number of Images or
the format in which those Images may appear in a particular post.  As to
these future Noticed Images, ContextLogic shall continue to keep and
maintain current screening measures and software and Content
Management Team in place to identify all **new and future posts** uploaded
to the Wish Website or Wish App in order to identify and achieve the take-
down of those Images that may infringe upon Venus's copyright that Venus
has provided sufficient Notice to ContextLogic, without limitation to the
number of images, the format in which those images may appear in a
particular post, or when those images are first identified to ContextLogic as
appearing on the Wish Website.

72

D.      ContextLogic shall immediately cease using any allegedly infringing Image that has been taken-down based upon sufficient notification and identification from Venus, now and in the future, in any of ContextLogic's promotional materials, including, but not limited to promotional emails, splash pages, postings on third-party cites such as Facebook, and by contract.

E.      ContextLogic shall implement a **repeat infringer policy** as required by the DMCA, that includes adequate recordkeeping to enable the identification of repeat infringers, and results in the termination of third-party Merchants from the Wish Website or Wish App who repeatedly or blatantly infringe upon Venus's copyrighted Images.

3.      Pursuant to Rule 65(c), as a condition to this injunction, Plaintiff shall post security **BOND** with the Clerk of the Court, on or before **4:00 p.m., on February 3, 2017**, in the amount of $250.000.00, the Court having determined that such amount is adequate for the payment of such damages as Defendant may be entitled to recover as a result of this Order.

4.      For the duration of this Preliminary Injunction, ContextLogic shall file with the Court a **STATUS REPORT** starting ninety (90) days from the date of the posting of the security bond by Venus, and every ninety (90) days thereafter, recounting how ContextLogic has complied with this preliminary injunction, including the dates and content of sufficient Notices received from Venus; the number of Images taken down from the Wish Website and Wish App; and the results, if any, from implementation of its

repeat infringer policy.  Venus may file a response to a status report within fourteen (14)

days of the docketing of the status report.

**DONE AND ORDERED** in Jacksonville, Florida, this 17th day of January, 2017.

BRIAN J. DAVIS
United States District Judge

jl

Copies furnished to:

Counsel of Record